## Edward G. Westcott and others v. The Minnesota Mining Company and others.

*Necessary parties in chancery: Excuse for failure to join.* In a bill involving the rights and interests of a corporation and its stockholders it is essential that all persons in interest be made parties, or that some satisfactory reason for not making them parties be set forth. Such bill should show who the present owners of shares in the corporation are, or it should set forth the efforts made to discover them, and should contain the proper averments that the bill is filed on their behalf as well as on behalf of the complainants named. The mere fact that a person, who is a proper party complainant, is a non-resident of the state, is no sufficient reason for his not being joined in the suit; nor is the failure to join the heirs of a deceased party in interest excused by the mere averment that the party died in another state, and that since his death diligent inquiry has been instituted and failed to ascertain who and where his heirs are, but that they are all non-residents of the state. Such averments are too general and vague.

*Notice of meeting to assess stock: What premature.* Where the articles of association of a joint stock association provide for an assessment to be levied upon the assessable shares of its stock, upon condition, among other things, that the proceeds of the sales of two hundred unassessable shares thereof shall first have been expended under the direction of the trustees, a notice given, while fifty shares of said unassessable stock remained unsold, of a meeting to be thereafter held for the purpose of making an assessment, was premature, and even though between the time the notice of such meeting was given and the time of holding the same such fifty shares were sold and the proceeds expended as required, still no valid meeting, for the purpose of an assessment, could be held in pursuance of such notice.

*Verbal notice insufficient.* A verbal notice of such meeting is not sufficient as to persons who did not appear at said meeting in response thereto, where the articles provide that the notice of regular meetings shall be given "by sending to the shareholders, at their respective places of residence, through the post-office, a written or printed notification, stating the object, time and place of holding such meeting; which notice shall be placed in the postoffice at least twenty days prior to the time of holding said meeting."

*Conditions precedent to right to forfeit stock.* The right to forfeit shares in any joint stock undertaking must come from the law, and can only be exercised in the manner prescribed by the law. In this case the articles of association are the law governing the right of forfeiture, and all the conditions precedent which are made by them must be strictly complied with or the proceeding is void.

*Defect of parties: Ground for dismissing bill.* Want of necessary parties is good ground for dismissing a bill on the hearing; and this will be done with less reluctance where the facts disclosed by the proofs fail to make out a strong case on the merits.

*Heard April 19 and 20. Decided July 7.*

Appeal in Chancery from Wayne Circuit.

The opinion contains a sufficient statement of the nature of the pleadings and of the facts proven.

23 MICH.—19.

*A. F. Wilcox, Levi Bishop, G. V. N. Lothrop* and *S. A. Goodwin,* for complainants.

*Samuel T. Douglass,* for defendants.

COOLEY, J.

This case is a sequel to that of *Titus v. The Minnesota Mining Co.,* reported in *8 Mich., 183.* The pleadings are exceedingly voluminous and the facts complicated, but the following, it is believed, is a sufficient statement of the case to make the decision of the court sufficiently clear:

The bill in the Titus case was for the purpose of compelling the defendants to deliver to complainant, for himself and associates, whom he claimed to represent, one-fifth of its capital stock, and to account to him for the profits of the company in the like proportion. On the final hearing, certain defects in parties were pointed out by the court, and the bill was dismissed. Afterwards the present suit was commenced, and is now brought to a hearing in the name of Edward G. Westcott, Henry R. Pierson, James R. Westcott, George Kimball, Marion Brinkerhoff, Jonas H. Titus, Jr., Catharine Titus, Omar D. Conger, Gertrude M. Galloway and Daniel A. Galloway, as complainants against the Minnesota Mining Company, Samuel O. Knapp, William Hickok, Enoch C. Roberts, Frederick W. Allen, Charles E. Smith, Samuel J. W. Barry, John Gilbert, Charles Lambert, Joseph M. Smith, Samuel Congdon, Elwood Burdsall, J. R. Burdsall, Joshua Gilbert, Horatio N. Davis and Joseph Trevor, as defendants.

The material allegations on the part of the complainants are the following:

In 1845 Jonas H. Titus, Smith Titus, Myron Titus, Platt S. Titus, Omar D. Conger, Walter Buddington, John McReynolds, Andrew T. McReynolds, Ira C. Backus, John

H. Harmon and Asahel S. Bagg formed themselves into a copartnership in mining operations, under the name of the Baltimore Mining Company; that such company became owners of two leases of lands for copper mining, in the Lake Superior district, numbered respectively 267 and 269; that on November 22, 1846, these leases were sold by the company to William Hickok for the use of himself and associates, and assigned to the said Hickok on the terms and conditions following: That said Hickok and his associates should form a company in the city of New York for mining purposes; the stock to be represented by four thousand equal shares, of which eight hundred paid up and unassessable shares should be issued within sixty days to the associates of the Baltimore· company, as the consideration for the assignment of said leases; that on or about November 30, 1846, said Hickok, with Enoch C. ·Roberts, Samuel ·O. Knapp, William Pearsall, Jr., Daniel A. Galloway, Charles Edgar Smith, Joshua Gilbert, Frederick W. Allen, ·Elwood ·Burdsall, Horatio N. Davis, Jacob Trevor, Samuel J. W. Barry and Charles Lambert as associates, did form the proposed mining company, under the name of the Vulcan Mining Company, and in their articles of association the said leases were declared to be purchased by said Vulcan Mining Company, and it was recited that such company was formed, among other things, to prosecute mining on the land specified in said two leases, or on any lands in said mineral district that might be leased, located or bought by said Vulcan company for mining purposes; that it was also further declared by said articles that the stock of said Vulcan company should be represented by four thousand shares, of which one thousand shall remain unassessable forever, and that eight hundred of these should be transferred to said Baltimore Mining Company; that either as original members, or as purchasers of shares of stock therein, the

defendants Hickok, Roberts, Allen, Pearsall, C. E. Smith, J. M. Smith, Congdon, Knapp, Barry, Gilbert, Lambert, E. Burdsall and J. R. Burdsall, and the complainant Daniel Galloway are now the owners of all the rights in the stock and property of the Vulcan Mining Company; that the premises described in said leases 267 and 269 were afterwards judged not to be valuable for mining, and the said Vulcan company, in November, 1847, purchased of the Ontonagon company one-half of the location known as No. 98, for mining purposes, taking an assignment of the lease thereof in the name of William Hickok, its then treasurer, but that afterwards, and with intent to defraud the associates of the Baltimore company of their one-fifth interest in the Vulcan company, said Hickok and the other associates in the last mentioned company proceeded to form a new company by the name of the Minnesota Mining Company, for mining on said one-half of location 98; the formation of said new company being merely a fraudulent device to give color of regularity and fairness to the proceedings of said Hickok and his confederates, in their design to defraud the Baltimore Mining Company of their said one-fifth interest in said purchase and its fruits; that said Minnesota Mining Company was in fact identical with said Vulcan Mining Company, each associate therein receiving at its organization the same number of shares held by him in the Vulcan company; that said Minnesota company afterwards became incorporated, and carried on mining operations on said half of location 98, and that the said half of location 98, after having paid all the expenses incurred in its development and workings, and large dividends for many years, is now worth large sums of money.

The complainants then proceed to aver the right of the associates of the Baltimore company to the one-fifth interest in said Minnesota company and to an account of the profits

thereof; they associate Daniel Galloway with themselves as complainant, with his assent, because since the transactions described he has intermarried with the complainant Gertrude M. Galloway, formerly Davis, one of the shareholders of the Baltimore company; they omit the name of William Pearsall, Jr., as defendant, on the allegation that he died in 1867, in the state of New Jersey, being then a resident of that state, but at what place they are unable to discover, and that "since he died they have diligently inquired and made efforts to ascertain where and who his heirs and legal representatives were, so as to make them parties to the suit, but have not been able to ascertain who or where they are," though they are informed they are all non-residents of Michigan, and their interests are small and well represented by the persons now parties to the suit; they aver that the Baltimore Mining Company still subsists under its articles, and that the complainants, either as original members or as purchasers of shares in said company, are (except as hereinafter stated) the owners of all rights, titles, interests, claims, estate and property in said company. The exception relates to two hundred shares of unassessable stock, which, by the original articles of said company, were to be disposed of, and the proceeds applied to the use of said company, before assessments were to be made on the other stock. In respect to these the averments are as follows: "All of said two hundred shares were disposed of and the proceeds expended for the use of the company before any assessment was made; that no assessment was made for more than sixty days after the date of said articles; that on July 28, 1846, ten shares of said two hundred shares were sold to the defendant Charles Edgar Smith; that on July 29, 1846, ten other of said two hundred shares were sold to one Calvin Sweezey; that on August 1, 1846, ten other of said two hundred shares were sold to the defendant Frederick W. Allen; that

on September 28, 1851, fifty other of said two hundred shares were sold to the complainant Jonas H. Titus, Jr., who is now the owner thereof; that the other one hundred and ten of said two hundred shares were also sold long before October 3, 1851, and the sales thereof were entered in a memorandum book of sales, and said book was lost or mislaid without such sales having been entered in the regular books of the association, and therefore your orators cannot tell or set forth who the purchasers were of said one hundred and ten shares; that complainants have made diligent efforts to ascertain where and who were the purchasers and owners of the said one hundred and ten shares, and where and who were the owners of said forty shares purchased as aforesaid by said Smith, Chadwick, Sweezey and Allen, but without success. Your orators charge the said defendants Charles E. Smith and Frederick W. Allen are now the owners of the shares thus purchased by them, and if it shall turn out that they, or either of them, are not such owners, your orators do not know who or where the owners thereof are, but your orators charge that they, whoever they may be, are not residents of the state of Michigan, and therefore your orators pray to be permitted to prosecute the suit as it is, and when such owners shall be discovered, if they shall be, your orators pray leave to make them parties to the suit by proper amendment and process. Your orators do not know whether said Sweezey and Chadwick are the owners of the shares thus purchased by them, nor do your orators know where said Sweezey and Chadwick, or whoever may be the owners of the shares thus purchased by them, reside; but your orators charge that they are non-residents of Michigan, and therefore your orators pray that they may be permitted to go on with the suit without making such owners parties, with leave to make them, if discovered, parties to the suit, by a proper amendment and process. Your

orators do not know where or who the owners of said one hundred and ten shares are, but your orators charge that they, whoever they may be, are non-residents of the state of Michigan, and therefore your orators pray that they may be permitted to go on with the suit, with leave to make the said owners of said one hundred and ten shares, if discovered, parties to the suit, by proper amendment and process."

After these allegations regarding their rights and equities, and this attempt to excuse the failure to bring in other parties having interests in the litigation, the complainants proceed to their prayers for relief and process, which need not be particularly referred to. The case was heard in the court below on pleadings and proofs, and the bill dismissed.

It must, I think, strike any one as extraordinary that it should prove impossible to ascertain who are the parties in interest and entitled to a share in the large property and profits of the Minnesota Mining Company, if the allegations of the complainants are sustained. It is indeed quite possible that any original record that was kept of the sales of this preferred stock may have become lost or mislaid as averred in the bill; but, to the extent that sales are now known to the complainants, the bill ought either to show who the present owners are, or it should set forth the efforts made to discover them, and contain the proper averments showing the bill to be filed on their behalf as well as on behalf of the complainants named. The stock sold to Smith and Allen it is fair to presume, until the contrary appears, that they still own; and as they are parties to the suit, there would be no difficulty, so far as they are concerned, in making the proper decree, but Sweezey and Chadwick are neither made parties, nor does it appear that any effort has been made to ascertain where they are, whether they still retain their interests or not, or if not, who have become

their assignees. The mere fact that a person who is a proper party complainant is a non-resident of the state is no sufficient reason for his not being joined in the suit,— *Whitney v. Mayo, 15 Ill., 255;* and the allegation that the orators do not know where such persons are, but charge that they are non-residents of the state, is a very imperfect and unsatisfactory attempt to excuse the failure to join them in a cause in which their interest is not merely nominal, but the same with that of the complainants named. Nor is the failure to join Pearsall's heirs any more satisfactory. He is alleged to have died in New Jersey in 1867, and if complainants knew this, it would certainly be a fair presumption that they must know at what place he died, and that inquiry there ought to elicit some information regarding his heirs or representatives. It is difficult to conceive how averments in excuse of a failure to join needful parties could possibly have been made more general, vague and unsatisfactory, than are these, and as the bill failed to ask any discovery as to the shares in the Baltimore Mining Company, not represented by the complainants, and also failed to show that it was filed on behalf of all the shareholders, we think the demurrer to the same on those grounds was well taken and should have been sustained. The court cannot make a decree binding parties in no manner before it, either in person or by representative; nor is it consistent either with the practice of the court or with justice that the defendants should be compelled to account with a part of the shareholders in the Baltimore company, leaving them subject to other similar suits on behalf of the others, unless a strong showing is made that justice to complainants is otherwise unattainable. This showing, we think, was not sufficiently made.

The difficulties are still greater, however, in the case of some other persons who were at one time interested in the

Baltimore Mining Company, but whose rights are claimed to have been forfeited by non-payment of assessments.

The only complainant who was a subscriber to the orginal articles of the Baltimore Mining Company is Omar D. Conger. Of his interest, there is no question. It was necessary for the complainants to show that the others had become purchasers of shares therein, and they seek to do this by evidence, a part of which comes from their records, and a part is the parol testimony of persons connected with the company and supposed to be familiar with its affairs. A record answering to a stock-book was produced, in which the articles of association were entered and signed by the original associates, and also by other parties as they acquired interests afterwards. This book, however, did not show from whom or how these subsequent parties acquired their interests, nor when or how any original subscriber ceased to be owner of shares, and it was rendered still more imperfect by the loss of one page of names, said to have been torn out by the carelessness of children. On this book the names of Edward G. Westcott, Gertrude Galloway (then Davis), James R. Westcott, Henry R. Pearson, Catharine Titus, George Kimball, and Marion Brinkerhoff first appear as owners of one share each, on September 28, 1851, at which time there must have been a considerable number of persons owners of shares in said company who are not now parties to this suit. The question is, how the complainants just named acquired their interests in said company, and in what manner those not named lost theirs.

The explanation on this subject comes almost exclusively from Mr. Jonas H. Titus, who was for a long time the president and chief manager on behalf of the associates of the Baltimore company. His testimony is that some time in the year 1851, an assessment of one dollar a share was levied upon all the assessable stock in the Baltimore com-

pany; that this assessment was paid by a part of the associates and the stock of the others forfeited by non-payment; that the complainants, Catharine Titus, Gertrude Galloway (then Davis), George Kimball, and Marion Brinkerhoff had become assignees of assessable stock prior to that time and paid their assessments upon the same, and that the complainants, Edward G. Westcott, Henry R. Pearson and James R. Westcott, became such assignees afterwards, by purchase of stock from those who had paid their assessments, but from which one of the same, or how much they purchased, he neither informs us, nor does any one else assume to do so.

We have already said that the names of the seven complainants just named first appear on the books of the company as owners of stock, September 28, 1851. If a part of them were owners of stock before the assessment, and a part only became such afterwards, the fact of their being all entered at the same time would seem to require some explanation, and that given by Mr. Titus, if we understand him correctly, is, that the names were originally upon the leaf accidentally torn out from the stock-book, and that after that circumstance they were written in the book again by one of their number, in order to make the list of stockholders complete. Assuming this explanation to be satisfactory, we will proceed to consider the evidence introduced to establish the facts that an assessment was duly levied, and that a portion of the stock was forfeited for non-payment.

The articles of association of the Baltimore Mining Company authorized assessments of not exceeding two dollars per share in a year to be levied upon the assessable shares in said company, upon certain conditions:

The first of these conditions was, that the proceeds of the sales of the two hundred unassessable shares should first have been expended under the direction of the trustees

The second was, that the assessments should be laid at a regular meeting of the association, by a vote of a majority in interest of the stockholders present or duly represented

The third was, that in the notice calling such meeting, it should be stated that one of the objects of the meeting was to consider upon the expediency of laying an assessment.

The fourth was, that the assessments should be payable at such times and in such sums as the same should be called for by the trustees pursuant to the authority given them by the vote laying such assessment.

The fifth was, that notice of any assessment should be given personally or by mail, to every shareholder liable to assessment, and who should keep the secretary informed of his place of residence, and then, if his assessment was not duly paid within thirty days after the same should become due and payable, the shares upon which the same was levied should be forfeited to the association, unless, for reasonable cause shown, the stockholder should be exempted from such forfeiture by a vote passed at a regular meeting of the association.

No very definite information is to be obtained from the evidence regarding the time when, or the place where, the meeting was held for the purpose of levying an assessment. A notice of the date of October 3, 1851, appears to have been published in one of the Detroit papers, which stated that an assessment of one dollar per share had been levied upon the stock, and that it must be paid to J. H. Titus, of the city of Detroit, on or before the fifth day of November then next, or the stock would be forfeited. The assessment, therefore, must have been levied on or before October 3, 1851. The notice of regular meetings, was by the articles, required to be given "by sending to the shareholders to their respective places of residence, through the post-office, a written or printed notification, stating the object,

time and place of holding such meeting, which notice shall be placed in the postoffice at least twenty days prior to the time of holding said meeting." The notice, consequently, must have been given as early as September 13, 1851, if given in compliance with the articles.

Now, in order to see whether any stock was legally forfeited, it may be well to consider in succession, each of the conditions precedent and the evidence which is supposed to show that it was complied with. And in considering these it is greatly to be regretted that the company kept no such records as would give us that full and satisfactory information which we have a right to look for in cases of this character, where rights are to be divested, under conditions which the parties have previously agreed upon, and which they understand must be complied with in order to render the proceeding effectual.

The notice of assessment was signed by Mr. Conger, as secretary *pro tem.*, and he undoubtedly acted as such at the meeting. Not being the regular secretary, however, it is not surprising that he kept only a rough minute of the proceedings, and we infer as well from his testimony as from that of Mr. Titus, that he assumed no supervision of the proceedings, and that his connection with them was rather formal than otherwise. The one important fact to which he testified is, that a majority in interest of the stockholders was represented at the meeting; and this fact we regard as established by his evidence. Upon other points we must look to the testimony of Mr. Titus, who appears to have had charge of the books and papers, for such information as is now attainable.

The testimony of Mr. Titus shows that there was never any record of the proceedings of the meeting at which the assessment was levied, beyond the rough minutes of the secretary *pro tem.*, which have not been preserved. It also

shows that there is no record of the expenditure of the proceeds of sales of the unassessable shares; but he testifies that they were all expended, and there is probably no doubt of that fact. But whether they were expended before the meeting was called for the purpose of making an assessment is not very clear. The name of Mr. Jonas H. Titus, Jr., is entered on the books as purchaser of fifty shares of unassessable stock, under date of September 28, 1851; and if this was the actual date of his purchase, this number of shares, at least, of the unassessable stock must have been held by the company at the time notice of the meeting was given. If this was the case, we think the notice was premature, and that no valid meeting for the purposes of an assessment could have been held in pursuance of it. Stockholders, aware of the fact that they had made it a condition that no assessment should be levied until the unassessable stock was sold and the proceeds disposed of, would have been entitled to treat as void a notice given while the company was still the owner of a fourth of this stock, and when, of course, its sale before the meeting should be held must have been matter of uncertainty. None of the stock was assessable until these two hundred shares were sold; and no stockholder, we think, was under obligation to take any notice of a call for a meeting to consider an assessment made at a time when his stock was not liable to one. A sheriff might as well advertise a sale upon execution before the writ was issued, and expect to support it by taking out the writ before sale actually made, as for the company to support an assessment based upon a call which was made at a time when an assessment was not leviable.

Assuming, however, that the first and second conditions to a valid assessment were complied with, it is very clear, we think, that notice of the meeting, as required by the articles, is not shown to have been given.

On this point, again, the evidence comes from Mr. Titus, and we give in full what he says concerning the notice, in order to show how far short it falls of proving knowledge on his part that due notice was given:

"Question. How was that meeting called?"

"Answer. It was called by personal notice, and by written notice."

"Q. Notice to all the stockholders?"

"A. Yes, sir, according to the articles of association."

"Q. Was it the custom of the secretary of the company to keep copies of those notices given to the stockholders, when meetings were called?"

"A. There never was any meeting called for assessment, except that one, and whenever a meeting was called, parties were notified; but that was a special assessment, and notice was given that the meeting would be called; a special meeting, to take into consideration the propriety of levying an assessment."

"Q. That was stated in the notice?"

"A. That was stated in the personal and written notice; not in the printed notice of the assessment after it was levied."

"Q. Have you looked for—made search for—a copy of those notices?"

"A. Yes, sir."

"Q. Been able to find them?"

"A. No, sir."

"Q. Will you state the contents of the notice; what the object of the meeting was as stated in the notice?"

"A. The stockholders were notified that the meeting would be held at a certain time and place."

"Q. For what purpose?"

"A. For the purpose of taking into consideration the propriety of levying an assessment."

"Q. As president of the company at that time, do you know whether that meeting was called according to the articles of association?"

"A. I know it was."

This was the testimony on the direct examination, and, although it will be seen the witness testifies most positively to his knowledge that notice was given in compliance with the articles, yet he makes a distinction between the written notice given to some of the stockholders and what he calls "personal" notice given to others, and by which we understand him to mean a mere verbal notice, which would not have been in compliance with the articles at all. On his cross-examination, he says further:

"Question. Was the notice of the meeting at which that assessment was made ever given to Samuel Knapp?"

"Answer. I don't recollect whether notice was given to him or sent by mail."

"Q. Will you swear that notice was either given to him personally, or sent by mail?"

"A. I will, to the best of my recollection."

"Q. Did you give the notices?"

"A. No, sir, I did not give them all personally. Conger may have written some of them, but I mailed them."

"Q. Will you swear that notice was given to Samuel Knapp?"

"A. Whoever were known parties, subscribers to the stock, that held anything in the stock, were notified, either verbally, or in writing."

"Q. Are you sure that, either verbally or by mail, Samuel Knapp was notified of that meeting?"

"A. I don't recollect whether he was here."

"Q. Did you personally, or by mail, give notice of that meeting to Thomas Corcoran, of New York?"

"A. If I knew he was a stockholder, I did."

"Q. Did you give notice, either personally or by mail, of that meeting, to all the persons whose names appear upon this list of subscribers to the stock of the Baltimore Mining Company, appearing in this book as stockholders?"

"A. I can't say, only generally."

"Q. To each one of them, did you?"

"A. If I knew they were stockholders."

"Q. No mattter whether you knew them or not. I ask whether you gave notice of that meeting to all the names that appear on this list of stockholders?"

"A. Yes, sir, I think so; that is my recollection; I don't know whether they ever got them or not."

"Q. Were their notices directed to their places of residence, as appears in this book?"

"A. Yes, sir; that was the only knowledge we had."

"Q. You say personal notice of the meeting at which the assessment was made, was given to some of the stockholders. Who gave it?"

"A. I gave most of them, I think."

"Q. You gave most of them?"

"A. I think so."

"Q. Did anybody else give any of these personal notices?"

"A. I don't know what they did; I don't know but Conger may have."

"Q. If the personal notices were given by both of you, and you don't know how many he gave, nor to whom, how do you know personal notice was given, except what was written notice?"

"A. I think I gave notice to all; that is my recollection."

"Q. Will you tell me how you gave personal notice?"

"A. All those that were holders."

"Q. Can you name any body to whom you gave personal notice of that meeting?"

" A.  I can't.  I went on and gave notice according to the rules and regulations."

" Q.  Can you name any one you gave personal notice to of that meeting?"

" A.  No, sir, I can't."

" Q.  Can you name any body to whom you gave written notice of that meeting? "

" A.  I sent written notices, a good many of them."

" Q.  To whom?"

" A.  I don't recollect; I recollect some of them."

" Q.  Is there any record or entry in the books of the company that shows to whom personal notice was given, and to whom written notice of that meeting was given?"

" A.  I have a memorandum."

" Q.  Will you produce it?"

" A.  No, sir, I have not got it here,—I would not produce it if I had; but it is my recollection."

" Q.  That you have a memorandum?"

" A.  Yes, sir, I think I made a memorandum at the time, and some of them responded and paid their assessment; that is my recollection."

" Q.  I didn't speak of their responding, but to whom you sent notice of the meeting when the assessment was made?"

" A.  Well, I have told you."

" Q.  Now I ask, whether there is any record anywhere on the books of the company of the names of persons to whom you sent the notice, or to whom you gave the notice personally?"

" A.  I know this: I told you they were all notified."

" Q.  Was there any record as to whom?"

" A.  Either personally or by mail."

" Q.  Now, I ask you again, whether there is any other

28 MICH.—21.

record on the books of the company, showing who was
notified, and how, of that meeting?"

"A. Not that I recollect; I have not got it, at any
rate."

"Q. Did you give the written notice?"

"A. I did, I think; I gave all the written notices."

"Q. Then you are not able to name the persons—any
of the persons—to whom you sent written notice, or to
whom you gave verbal notice?"

"A. How many times do you want that answered?
There is no record of it."

Such is the testimony of Mr. Titus, to prove notice of
this meeting, and it is hardly necessary to point out the
particulars in which it fails to show, satisfactorily, that due
notice was given. We shall assume that the witness fully
believed the notice to have been sufficient, but it is not
the fair inference from the testimony, when the whole is
considered, that the notices were all given by him in person;
and we think he is very clearly mistaken in supposing
that a verbal notice was in compliance with the articles.
The parties, in associating, clearly had a right to stipulate
for any notice they saw fit; and we cannot say that a
different one would have been equally effectual, and therefore
must be held sufficient. There were reasons which they
might have regarded of much force for insisting upon a
written notice in every instance, and when proceedings *in
invitum* were taken against them, they were not bound to
give heed to any other; had they appeared at the meeting
in response to the notice, they might be held to have
waived strict compliance.—*Schenectady etc., Plank R. Co.
v. Thatcher, 11 N. Y., 102;* but Mr. Titus's testimony shows
that those, whose stock was declared forfeited, were not
present. Moreover, several who were then stockholders were

sworn as witnesses and testified that they received no notice whatever of the meeting; so that the evidence is very strong that there was a failure at some point in giving the notices. And no one attempts to testify that the notice was given twenty days before the meeting, unless Mr. Titus's general statement that it was in compliance with the articles, can be regarded as covering that ground. But that was swearing to a conclusion of law, rather than a statement of facts.

The right to forfeit shares in any joint stock undertaking must come from the law, and can only be exercised in the manner prescribed by the law.—*Matter of the Long Island R. R. Co., 19 Wend., 40.* In this case the articles of association were the law governing the right of forfeiture, and all the conditions precedent which were made by them must have been strictly complied with, or the proceeding would be void.—*Portland etc., R. R. Co. v. Graham, 11 Met., 1; Lexington etc., R. R. Co. v. Staples, 5 Gray, 522; Alabama etc., R. R. Co. v. Rowley, 9 Fla., 508.* We are compelled to say that no compliance is shown in this case; nothing which warranted the company in forfeiting the stock of a single member. If, hereafter, the persons who were members at the time the alleged assessment was made should come forward with a like demand to that made by complainants, there is nothing in this record to preclude their supporting it. The result is that a number of necessary parties are not before the court, and that the circuit court decided correctly in dismissing the bill.

The necessity of dismissing the bill for defect of parties would be matter of serious regret if it were probable that upon the merits the complainants were entitled to relief; but after listening to very full and able arguments on their behalf, and after careful examination of the facts, we do not find that the case, upon which this court

expressed its opinion adverse to their claims in the suit brought by Titus, has been materially strengthened by the evidence now produced.

The decree of the circuit court in chancery, dismissing the bill, must be affirmed, with costs of this court.

CHRISTIANCY and GRAVES, JJ., concurred.

CAMPBELL, CH. J., did not sit in this case.