## The People on the relation of John Pulford v. The Fire Department of the City of Detroit.

*Forfeiture : Notice: Burden of proof : Evidence : Construction.* Where a total forfeiture of important rights is asserted to have been created by proceedings of which the owner had no actual notice,' the party insisting on the forfeiture has the burden of making it out in all particulars; and no presumptions will be allowed in its favor. The authority must be clearly shown and strictly construed.

*Existing association : Charter : Constitution.* Where an existing association is chartered and· its constitution is expressly recognized by the charter, such constitution thereby becomes practically, by reference, a part of the charter.

*Corporations : Assessments.* The right to levy burdens on members of associations or corporations is governed, to some extent, at least, by the occasion for them.

*Forfeitures : Authority : Sovereignty.* There can be no power to impose forfeitures unless granted by clear legislative enactment. No such power is consistent with common law or ancient right, and it cannot be obtained from any thing but the sovereignty.

*Corporate charges and penalties : Analogy of actions : Summary methods.* The only implied means for the enforcement of corporate charges and penalties is by action. Summary means and methods unknown to the common law must be authorized by express authority, and a pecuniary obligation or penalty cannot reasonably be enforced by means disproportionate to its importance; and the law of the land is made the test for analogies in cases where it affords them.

*Forfeiture : Alleged default: Notice: Hearing.* It is abhorrent to all reason to allow a forfeiture to be enforced on an alleged default without notice and a hearing, or an opportunity to be heard.

*Corporations : By-laws : Penalties for violations : Expulsion.* Under the provisions of our general corporation law (*Comp. L.*, *1871*, § *3429*) limiting the penalties for violations of by-laws, expulsion for any mere infraction of a by-law would not be allowable.

*By-laws : Regulations : Ex post facto provisions : State policy.* By-laws or regulations are properly only rules for future action; and *ex post facto* laws are no more lawful for corporations than for states; and all by-laws contrary to the general principles of the common law or the policy of the state are void.

*Corporations : Membership : Default in payment of dues : Inconsistent regulations.* A provision that a member in arrears cannot withdraw is repugnant to any regulation making membership cease, *ipso facto*, or otherwise, on default of dues.

*Corporation : Constitution : Amendment : Membership : Expulsion : Ex post facto provisions.* The effect of an amendment of the constitution of a corporation which before contained no such provision, whereby it was declared that any member who should fail to pay the whole of his dues which should then be in arrears, or any indebtedness to the corporation on or before a day named, should from and after that day cease absolutely to be such member without any further action whatever of the corporation or its trustees, and that the secretary should drop the names of all such delinquent persons from the roll of members, is not that of a regulation, but of an adjudication on existing defaults, analogous to a foreclosure decree fixing a short term of payment; and it is clearly *ex post facto*, in that it enforces a new penalty beyond those existing at the time of default.

PULFORD *v.* FIRE DEPARTMENT OF DETROIT.

*By-laws: Dues: Defaults: Notice: Forfeiture: Constitution: Amendment: Expulsion.* And where by the by-laws personal notice is required to be given in February of each year to defaulting members, and there can be no forfeiture without, such an amendment, leaving the declaration of the forfeiture to the secretary, who acts as witness and judge on his own assertion, and without either hearing or appeal, and in a matter made to depend on his own performance of a prior duty, is clearly incompetent.

*Fire department of Detroit: Organization: Changes in policy: Membership.* The history of the organization and changes in policy of the respondent corporation, so far as it relates to the question of membership and bears upon the right of expulsion under the amendment in question, is considered.

*Heard April 9. Decided April 20.*

Application for *Mandamus.*

*S. Larned* and *F. A. Baker,* for relator.

*G. V. N. Lothrop,* for respondent.

CAMPBELL, J.

The relator, General John Pulford, applies to be restored to his position as a member of the fire department, which the respondent claims was forfeited during the absence of relator on military duty during the war, for non-payment of yearly dues. Relator is not shown or alleged to have received any personal notice of the default in his dues, or of the proceeding to forfeit his membership. On his return after the war, in 1865, he applied for restoration and offered to pay his dues, as he did also before commencing this proceeding, but was refused.

The forfeiture relied on is by an amendment to the constitution of the department, passed on the 13th of May, 1863, whereby it was declared that any member who should fail to pay the whole of his dues which should then be in arrears, or any indebtedness to the department on or before the 1st day of August, 1863, should "from and after that day cease absolutely to be such member, and without any further action whatever of said department, or its board of trustees thereupon; and the failure to pay all dues remaining unpaid on the 1st day of June in each year thereafter,

by any member, shall work the same forfeiture of membership, and in each case the secretary shall drop the names of all such delinquent persons from the roll of members."

It is apparent that before May 13th, 1863, there was no provision for forfeiting the rights of members for any such delinquency. The case does not show what former clause of the constitution was superseded by this.

To explain the occasion of this change, the respondent, by its president and secretary, states that the change of the fire system of Detroit, whereby a numerous volunteer body of firemen was replaced by a small body of paid firemen, led to a diminution of interest in the association, and many members failed to pay their annual dues; that the corporation was in debt above sixty-three thousand dollars, and its income did not pay the interest, and the course referred to was adopted to compel payment or cut off delinquents. It is not stated that this reason was adopted or expressed by any resolution of the corporation or trustees, and it is fair to assume that from lapse of time there has been some mistake as to this reason, since the annual dues were only fifty cents, and the further regulations adopted at or about the same time tended to diminish, and not to increase the list of paying members. No attempt was made or directed to bring notice home to any member of the new measure, so as to induce or enable him to pay up in time to save his rights; and the circumstances of the period, when very many members must have been absent in the field, were such as to render it certain that a considerable number must be cut off without fault or chance to save their rights. The financial reason does not seem likely to have been reliable or very plausible, and if the action is valid it must stand on strict legal power. It has no shadow of equity.

Where a total forfeiture of important rights is asserted to have been created by proceedings of which the owner had no actual notice, the party insisting on the forfeiture has the burden of making it out in all particulars. No

presumptions will be allowed in its favor. The authority must he clearly shown and strictly construed.— *Westcott v. Minnesota Mining Co., 23 Mich. R., 145 ; Rex v. Richardson, 1 Burr., 540 ; Rex v. Liverpool, 2 Burr., 731.*

If .we stood upon the return alone, there are no allegations which would give color to the forfeiture. It does not appear what authority existed to change either constitution or by-laws by constructive notice, and it is not alleged what notice was required, or what was the time when the notice was dated, or on what days it was published, or what vote or other step was required to make the changes regular. We have supposed from the terms of the argument that we were expected to look into the constitution and by-laws, so far as they have been furnished, and as there is enough in the documents presented to enable us to be sure we can deal properly with the rights of the parties without any further light, we shall not find it necessary to suggest any further return or issue.

It is much to be regretted that the pecuniary interests involved are not large enough to warrant a more thorough investigation than the parties have made. The case suggests some very important inquiries, and presents some remarkable features. It is evident that many things have been done without a proper consideration or understanding.

The pamphlet containing the regulations of the corporation contains separately a constitution and by-laws. It does not contain the constitution as it was originally in force, and it appears from dates set forth in several places that some radical changes must have taken place in 1861 and 1863. It contains at the last article of the constitution, a rule for making amendments, which are to be first adopted by the trustees, at a regular board meeting, and then adopted by a two-thirds vote of members present at a department meeting, after notice of the proposed amendment and of the time of meeting shall have been published in at least one city newspaper one week next preceding the

time of such meeting.    A by-law requires publication of
notices of meetings in two city papers.

If the amendment in question was published for the
requisite time and in the proper form, it would come within
the letter of the last article.    The return does not show,
as it ought to, the dates of publication.    If legally pub-
lished, the remaining questions would bear upon the right
to make such an amendment for the purposes sought to be
subserved.    To ascertain this it may be proper to look into
the charter and the legal history of this body.

The charter was granted in 1840.    It is entitled "An
act to incorporate the Fire Department of the city of De-
troit."    Its preamble is as follows: "Whereas, the mem-
bers of an association known as the 'Fire Department of
the City of Detroit' have petitioned the legislature to grant
them an act of incorporation, to enable them more effectu-
ally to accomplish the objects of their organization, and to
provide means for the relief of disabled firemen and their
families: Therefore (Section 1.), Be it enacted, etc., that
all persons who are now, or may hereafter become members
of the Fire Department of the city of Detroit, and their
successors, shall be and are hereby ordained, constituted
and declared to be and continue a body corporate and pol-
itic, in fact and in name, under the name and style of the
'Fire Department of the city of Detroit,' for the purposes
recited in the above preamble."    In 1861, after relator had
been a member for some years, the legislature amended this
by adding an additional purpose, which was in 1869 still
further supplemented so as to include institutions for moral
and intellectual improvement, and the relief of such home-
less and destitute persons of the city of Detroit as they
may select.

The primary purpose was benevolent aid to disabled fire-
men and their families.    This has never been changed,
and the organization was originally designed to entitle indi-
gent and disabled members and their widows and orphans

to relief, and "for no other purpose whatsoever" (*sec. 6*); and membership became valuable on this account. The other purposes have been added since, as above mentioned.

When this corporation was chartered it was already an existing association, and its constitution is recognized expressly by *section 3.* It became practically by reference a part of the charter, and the charter could only be changed by a two-thirds vote of the legislature. *Section 2* provides that the corporation may make and change its "*by-laws, rules, ordinances and regulations*" at pleasure, touching a large variety of subjects. Whether the constitution can be changed except for those purposes expressly enumerated is a question of some importance, which was not argued, and which we shall not discuss.

Among other things to be regulated was "*the admission and expulsion of members.*" It is under this power that the action of the corporation in the present case is defended. And as all these regulations were required to be subject to the laws of the state, the conditions' of membership require some notice.

When this corporation was created, it was made up of members who belonged to the volunteer fire companies of Detroit, and was in a measure auxiliary to the city organization, to such an extent that in the charter of 1857 this act is one of the acts it was deemed proper to enumerate as not to be repealed thereby.—*Charter of Detroit, chapter relating to repeals.* All firemen were appointed or accepted and removable by the city authorities, who thereby held a certain control over the membership of this corporation. The board of trustees of this association was made up of its own officers and of the chief engineer appointed by the city and delegates from the city fire companies, and not of trustees elected by members of the corporation.—*L. 1840, p. 13;* Original Charter, sections *3, 5.* And all certificates to exempt firemen from militia and jury duty were, by *section 7*, required to be issued by this corporation, thereby investing them with a public func-

tion, and giving them authority over every fireman in the city. As originally organized the corporation would have been perpetually auxiliary to the city, and there could be no falling off of its membership to any great extent, if at all. We have not been furnished with the original constitution so as to be able to ascertain the precise terms of membership, but the charter indicates its dependence on the city organizations for very important purposes.

The changes in the corporation regulations in 1861 indicate that the city was contemplating or making new provisions in regard to firemen, and that the volunteer system was to be given up. In that year the board of trustees and officers were all required to be chosen from and by the members of the association; and other changes were made indicating that the plans of the corporation were to be altered.—*L. 1861, p. 322.* Subsequently, and before the amendment of 1863, the corporation amended its constitution so as to allow no further admission of full memberships, except to persons who had, prior to September, 1861, served as firemen two years before the disbanding of their companies. None of these could be admitted without the consent of the trustees, who had uncontrolled discretion in the matter. And after January, 1863, there could be no new members whatever with full privileges or with the right of voting. The steps to weed out the members in arrears began at the time when new memberships ceased. As the constitution and by-laws now stand, and have stood during this interval, there can only be members by survivorship. The course taken, instead of being for the preservation, is for the extinction of the society, and for what purpose this course is taken, we are not called upon to conjecture, nor can we in this proceeding deal with it. But it is not consistent with the theory set forth in the return, and does not indicate that the measures of 1863 were taken for the purpose of securing a larger income from members. And it is very well settled that the right to levy burdens on members is governed to some extent, at least, by the occa-

sion for them.—*London Pipe Co. v. Woodroffe, 7 B. & C., 838.*

As the original constitution contained no authority to forfeit membership, the power must be derived elsewhere. The charter contains no such power. It is held in *Matter of Long Island R. R. Co., 19 Wend., 37,* that there can be no power to impose forfeitures unless granted by clear legislative enactment. No such power is consistent with common law or ancient right, and it cannot be obtained from any thing but the sovereignty.—*Westcott v. Minnesota Mining Co., 23 Mich., 145; Kyd on C., 109; Angell & Ames, § 340, 360.*

The only implied means for the enforcement of corporate charges and penalties is by action. Summary means and methods unknown to the common law must be authorized by express authority. And it would not be reasonable to enforce a pecuniary obligation or penalty by means disproportionate to its importance. The law of the land is made the test for analogies in cases where it affords analogies, as is recognized in the case cited and elsewhere. If the constitution had originally contained such conditions, the charter might have confirmed them. But it did not.

It is equally abhorrent to all reason to allow a forfeiture to be enforced on an alleged default, without notice and hearing, or an opportunity to be heard.—*Roehler v. Mechanics' Aid Soc'y, 22 Mich., 89; Com. v. German Soc'y, 15 Pa. St., 251; Queen v. Saddlers' Co., 10 H. of L. Cases, 404; Com. v. Penn. Beneficial Asso., 2 S. & R., 141; Ang. & A., § 360.* If any expulsion could be had for such a cause, the by-laws themselves expressly require that there shall be a trial before the trustees, who for this purpose act as a corporate tribunal.—*By-laws, Art. 3, Sec. 5.* But, inasmuch as our general corporation law has always limited the penalties for violations of by-laws, expulsion cannot be allowed for any mere infraction of a by-law.—*R. S., 1838, p. 228; C. L., § 3429.*

Moreover, a by-law, or regulation, means a rule for future action. *Ex post facto* laws are no more lawful for

corporations than for states.    And all by-laws contrary to the general principles of the common law, or the policy of the state, are void.—*Ang. & A.*, §§ *332, 335, 339 ; Taylor v. Griswold, 2 Green, N. J., 223 ; Philips v. Wickham, 1 Paige R., 590.*    The dues of this corporation all accrued in January of each year, and at no other time.—*By-laws, Art. 3, Sec. 3.*    The penalty for not paying them then was, and still is, deprivation of a right to vote and other membership privileges until paid.—*Ibid.;* also *Art. 2, Sec. 1,* concerning elections.    A member who is in arrears cannot withdraw (*Art. 3, Sec. 4*); and this provision is repugnant to any regulation making membership cease, *ipso facto*, or otherwise on default of dues.

The effect of the amendment of 1863 was not that of a regulation, but of an adjudication on existing defaults, analogous to a foreclosure decree fixing a short term of payment. It enforced a new penalty beyond those existing at the time of default.    In this it was clearly *ex post facto*.

But it is open to other serious objections.    By the by-laws, personal notice is required to be given in February of each year to defaulting members, and there can be no forfeiture without.—*Art. 1, Sec. 6, By-laws.*    This amendment left the declaration of the forfeiture to the secretary, who acts as witness and judge on his own assertion, and without either hearing or appeal, and in a matter made to depend on his own performance of a prior duty.

The whole system appearing in these regulations is full of inconsistencies which have resulted from changes made without harmonizing them, and from a revolution in the policy and sources of membership.    A very few years will destroy the scheme unless they are prudently revised, and measures adopted for new memberships.

The relator has never been lawfully deprived of his rights in the association, and a *mandamus* should issue to restore him as prayed; and he will be entitled to costs of the application.

COOLEY, J., and GRAVES, CH. J., concurred.