## Edward H. Durkee v. The People ex rel. F. M. Askren.

1. BY-LAWS—*Power of Corporation to Make.*—A railroad company has power to make by-laws not inconsistent with its charter or the purpose of its creation nor repugnant to the common law. It has no power, however, to change or abrogate any provision of the law of its existence by means of a by-law.

2. CORPORATIONS—*Power of Bondholders to Vote.*—Under the provisions of a charter conferring upon the stockholders the power to elect

the directors of the corporation and regulating the exercise of such power, a by-law giving the holders of bonds issued by the corporation the right to vote for directors, is void, as being in conflict with the constitution and statute and against the policy of the State, and as an alteration of the charter.

3. SAME—*Bonds—Void Conditions.*—A provision made by a corporation and contained in its bonds and mortgage, that the holder of bonds may vote at meetings of stockholders, is in violation of express statutory and constitutional enactments, and is inoperative and void.

4. SAME—*Illegal Contract—Ratification.*—A contract which a corporation can not make, it can not ratify or make valid by any subsequent act. If there is no power to make it, there is equally a lack of power to confirm it.

5. SAME—*Void Contracts—Estoppel.*—A contract void as against a statute can not become operative and valid through an estoppel. There is no estoppel against showing that a contract is invalid, as in violation of a statute or against public policy.

6. SAME—*Powers of, etc.*—Corporations possess such powers, and such only, as are conferred upon them by the law of their creation. Parties who deal with them are chargeable with notice of their powers and the limitations of their capacity, and can not plead ignorance of the public laws and constitution.

7. SAME—*Ultra Vires—Estoppel.*—A person contracting with a corporation, where the contract is within the scope of the corporate powers under the charter, has a right to assume that its officers, in the management of its affairs, have complied with all the conditions necessary to the exercise of the power. If the contract with the corporation can be valid under any circumstances, an innocent person has a right to presume the existence of such circumstances. In such cases, the corporation and its stockholders may be estopped from avoiding the contract or denying the existence of the requisite conditions.

Memorandum.—Quo warranto proceedings. Appeal from the Circuit Court of Peoria County; the Hon. THOMAS M. SHAW, Judge, presiding. Heard in this court at the December term, 1893, and affirmed. Opinion filed February 22, 1894.

The opinion states the case.

JACK & TICHENOR, attorneys for appellant.

R. J. COONEY, state's attorney, and STEVENS & HORTON, attorneys for appellee.

MR. JUSTICE CARTWRIGHT DELIVERED THE OPINION OF THE COURT.

An information in the nature of a quo warranto was filed in pursuance of leave granted for that purpose, upon the

relation of M. F. Askren, against Edward H. Durkee, the appellant, to contest the right of appellant to hold the office of director of the Toledo, Peoria and Western Railway Company. A demurrer was interposed to the information and the demurrer being overruled, appellant elected to abide by it, and judgment of ouster and for costs was entered against him.

The facts appearing in the information, which it is necessary for us to state, are as follows: The Toledo, Peoria and Western Railway Company was organized March 28, 1887, under the general law of this State for the incorporation of railway companies, with a capital stock of $4,500,000 for the purpose of constructing a railroad from the eastern boundary line of the State, at a fixed point, westerly through certain counties to the western boundary line of the State at the city of Warsaw, and also by a branch from La Harpe to Burlington, in the State of Iowa.

At the time of such organization Charles Moran and Thomas Denny, of the city of New York, owned a railroad which answered the description of such proposed railroad, and formerly known as the Toledo, Peoria and Western Railroad, which they proposed to sell to the Toledo, Peoria and Western Railway Company.

Their proposition was as follows: "The undersigned hereby subscribe for 44,991 shares of the capital stock of the Toledo, Peoria and Western Railway Company, amounting to the sum of $4,499,100 (the shares being $100 each), provided always, and this subscription is made only upon one condition, that the manner and terms of payment hereinafter specified are, by the board of directors and the incorporators and the remaining stockholders of said company, accepted as a part of this contract of subscription.

"The terms of payment hereinbefore referred to are as follows: The subscribers shall convey by proper indenture of deed or bill of sale, to the Toledo, Peoria and Western Railway Company, the railway now held by the subscribers constructed in the State of Illinois, commencing at the eastern boundary line of the State of Illinois, in the county of

Iroquois, at a point where the present Toledo, Peoria and Western Railroad Company connects with the Toledo, Logansport and Burlington Railway Company now called the Chicago, St. Louis and Pittsburg Railroad, in the State of Indiana, and to extend thence westerly through the counties of Iroquois, Ford, Livingston, McLean, Woodford, Tazewell, Peoria, Fulton, McDonough, Hamilton and Henderson, to the western boundary line of the State of Illinois, at the city of Warsaw, and also at the town of Hamilton, on the Mississippi river, and also by a branch from La Harpe to Burlington, in the State of Iowa, and in consideration therefor shall be paid the shares of stock hereinbefore subscribed for, and also 4,500 of the first mortgage bonds of the Toledo, Peoria and Western Railway Company of $1,000 each, amounting to $4,500,000, having thirty years to run and bearing interest at four per cent per annum, the said railway and property being estimated, accepted, taken over by the Toledo, Peoria and Western Railway Company at the value of $8,999,100, the said amount to be represented by the said 44,991 shares of stock, and said 4,500 first mortgage bonds."

Said proposition of Moran and Denny was accepted June 25, 1887, by the incorporators, directors and remaining stockholders of the railway company. The incorporators and first board of directors had before this time, on the day that the articles of incorporation were issued, adopted by-laws among which were the following :

No. 2. At all meetings of the stockholders the owners of bonds of the company which, by the terms of their issue, confer voting power, shall be entitled to vote on their bonds ; that is to say, one vote either in person or by proxy on every one hundred dollars of bonds owned for thirty days next preceding such meeting.

No. 5. At each annual meeting of the stockholders there shall be elected by ballot three directors to serve for three years to fill the place of office of those whose terms shall then expire, and such further number of directors as shall be necessary to fill any vacancy.

No. 16. The stock of the company shall be transferable on the books of the company by the stockholders or their legal representatives on surrender of the certificate or upon satisfactory proof of their loss, and in case of loss, only upon the delivery of a bond of indemnity satisfactory to the executive committee or board of directors.

Upon the acceptance of the proposition of Moran and Denny, the incorporators, directors and stockholders provided for the issue of 5,000 bonds of $1,000 each, maturing and bearing interest as stated in the proposition, and for making a mortgage or trust deed securing the same, and providing that the holder of each bond should have the right to vote thereon at all meetings of the stockholders, one vote for each one hundred dollars of said bonds.

Afterward, the railroad company issued the capital stock in the sum of $4,500,000, and executed 5,000 bonds of $1,000 each, as provided, and delivered to Moran and Denny $4,499,100 of the capital stock and $4,500,000 in bonds, retaining 500 bonds for future use; and secured all said bonds by mortgage on the railway property, in which mortgage it was provided that the holders of bonds might vote at any and every meeting of the stockholders, one vote for every $100 of bonds held by the person proposing to vote, for a period of thirty days prior to the holding of any meeting.

The bonds issued contained a provision that the holder might vote as above stated, and the stock certificates contained a provision as follows:

"This certificate, and the stock represented hereby, is issued, received and held, subject to five thousand bonds of one thousand dollars each, secured by a mortgage of all the property now owned or hereafter to be acquired by this company and to said mortgage, and to the right given in each of said bonds to the holder thereof to vote thereon at all the meetings of the stockholders of the company, one vote for each one hundred dollars of said bonds."

There was also a notation upon the certificate as follows:
" This stock is subject to bondholder's right to vote at all

meetings of stockholders, countersigned and registered. The Corn Exchange Bank, registrar of transfers."

The relator became the owner of stock of the corporation by purchase in the usual course of business more than thirty days prior to an election held September 11, 1893, and at that election he and appellant were candidates for the office of director. Both were eligible, and votes were cast for each by holders of stock and holders of bonds. If the holders of bonds were entitled to vote the appellant was elected, but if the agreement that they might vote was invalid, the relator was elected, as he received a majority of the stock vote. The by-laws adopted, as before stated, have ever since remained in force as by-laws of the corporation. The question to be decided is whether the bondholders had a right to vote in pursuance of the by-laws and said agreement.

The railway company had power to make by-laws not inconsistent with its charter or the purpose of its creation, nor repugnant to the common law, and was expressly authorized by its charter to establish by-laws for the management of its affairs according to law. It had no power, however, to change or abrogate any provision of the law of its existence by means of a by-law, and if the by-law empowering bondholders to vote at stockholders' meetings is in conflict with the law under which the corporation is organized it is necessarily void. In the statute under which this company was incorporated the following provisions are found:

Sec. 8. All the corporate powers of every such corporation shall be vested in and be exercised by a board of directors, who shall be stockholders of the corporation, and shall be elected at the annual meeting of the stockholders, at the public office of the corporation within this State. * * *

Sec. 11. In case it shall happen at any time that an election of directors shall not be made on the day designated by the by-laws of such corporation for that purpose, the corporation for such cause shall not be dissolved, if within ninety days thereafter the stockholders shall meet and hold an election for directors in such manner as shall be

provided by the by-laws of such corporation: Provided
that it shall require a majority in value of the stock of such
corporation to elect any member of such board of directors,
and a majority of such board of directors shall be citizens
and residents of this State.

Sec. 25.   In all elections for directors or managers of such
railway corporations, every stockholder shall have the right
to vote, in person or by proxy, for the number of shares of
stock owned by him, for as many persons as there are direc-
tors or managers to be elected, or to cumulate said shares,
and give one candidate as many votes as the number of
directors, multiplied by the number of his shares of stock
shall equal; or to distribute them on the same principle,
among as many candidates as he shall think fit; and such direc-
tors or managers shall not be elected in any other manner.

Said section 25 was enacted in pursuance of section 3,
article XI of the constitution, which contains the same
provision and prohibition concerning the election of direct-
ors by stockholders as section 25 of the statute.

By these provisions the power to elect directors of the
corporation was conferred upon the stockholders, and the
exercise of the power was regulated. It may be conceded
that the primary object of adopting the constitutional pro-
vision, and the like provision in the statute, was to protect
minorities in bodies of stockholders, but that fact would not
change or affect its force, for such object would be defeated
by subjecting the right of stockholders to interference by
the votes of bondholders unregulated by law. The by-law
in question would give the bondholders control of the cor-
poration instead of the stockholders, for there was but
$4,500,000 of stock and $5,000,000 of bonds. The amount
of bonds delivered to Moran and Denny equaled the whole
capital stock, and the exercise of the privilege of voting on
the bonds so delivered to them would double the voting
power, authorized by law. No by-law could extend or re-
strict that power as fixed and regulated by the constitution
and the charter. The by-law in question being in conflict
with the constitution and statute and against the policy of

the State, and proposing an alteration of the charter and a continued violation of the law, was void. State of Nevada ex rel. v. Curtiss, 9 Nevada 325; People ex rel. v. Fire Department, 31 Mich. 458.

The provision made by the corporation and contained in the bonds and mortgage, that the holder of bonds might vote at any and every meeting of stockholders, is subject to the same objections as the by-law. Being in violation of express statutory and constitutional provisions the agreement was inoperative and void. Penn v. Bornman et al., 102 Ill. 523; 2 Parsons on Contracts, 5th Ed., p. 673.

Nor has such agreement become binding by subsequent ratification, acquiescence or estoppel. Whether bondholders have ever exercised the supposed right to participate in the management of the affairs of the corporation does not appear, but assuming that such is the fact and that they have been permitted to do so without objection, the agreement would not thereby become operative. A contract which the corporation could not make, it could not ratify or make valid by any subsequent act. If there was no power to make it there would be equally a lack of power to confirm it. Board of Commissioners, etc., et al., v. L. M. & B. R. R. Co. et al., 50 Ind. 85.

In the transaction Moran and Denny subscribed for 44,991 shares of stock which constituted the entire capital stock except nine shares, and the holders of those nine shares assented to the arrangement. All the stock, therefore, came either through Moran and Denny or through the holders of the remaining nine shares, all of whom participated in the transaction. The condition that bondholders might vote was printed in the certificates so that all holders had notice of the provision. But neither notice of, nor assent to, an illegal transaction, nor acquiescence merely on the part of a stockholder in acts in execution of such transaction will prevent him from withholding further assent, and preventing further execution of it, unless an estoppel can be invoked under some recognized rule of law. The mere fact of participation on the part of the corporation or stockholders

in an agreement in violation of the charter could not produce that result, which would be in effect abrogating the charter.    Penn v. Bornman, 102 Ill. 523.

There is no question of fraud or bad faith in this case. No one was deceived or misled as to any fact.    It is to be observed that the right of bondholders to vote at stockholders' meetings was not made a condition in the proposition of Moran and Denny to the corporation.    It was not a condition imposed by them, but appears to have been rather a matter of grace or favor to them; but if it were to be regarded as a condition of the contract of sale, its illegality arose from the fact that it was a violation of the statutes of the State, and a contract void as against a statute can not become operative and valid through an estoppel.    There is no estoppel against showing that a contract is invalid as in violation of a statute or against public policy.    Brightman v. Hicks, 108 Mass. 246; Langan v. Sankey, 55 Ia. 52; Tibble v. Anderson, 63 Ga. 41.

Corporations possess such powers, and such only, as are conferred upon them by the law of their creation.    This corporation was organized under a general and public law of the State which defined the lawful limits of its capacity. The parties who dealt with it are chargeable with notice of its powers and the limitations of its capacity and can not plead ignorance of the public laws and the constitution. No one could be deceived into the supposition that the corporation could lawfully make such a contract as the one in question, for the want of power to make it would be apparent from the public law.    In such a case every person is bound in dealing with a corporation, to take notice of the extent of its powers.    Pearce v. M. & I. R. R. Co. and P. & I. R. R. Co., 21 Howard, 441; McGregor v. Official Manager of the Deal & Dover Ry. Co., 16 Eng. L. & Eq. 180; New Orleans, etc., Steamship Co. v. Ocean Dry Dock Co., 28 La. Ann. 173; Franklin County v. Lewiston Institution for Savings, 68 Me. 43; Davis et al. v. Old Colony R. R. Co., 131 Mass. 258; Hackensack Water Co. et al. v. DeKay et al., 36 N. J. Eq. 548; Monument National Bank v. Globe Works, 101 Mass. 57.

The cases cited by counsel for appellant in support of the proposition that a corporation is estopped from asserting that a contract is *ultra vires*, where it has received a benefit under the contract, are cases where the making of such contract was within the scope of the corporate franchise, and the contracts were sought to be avoided because there was a failure to comply with some regulation, or the power was improperly exercised.

In Davis v. Old Colony R. R. Co., *supra*, it is said: "There is a clear distinction, as was pointed out by Mr. Justice Campbell in Zabriski v. Cleveland, Columbus & Cincinnati Railroad, by Mr. Justice Hoar in Monument Bank v. Globe Works, and by Lord Chancellor Cairns and Lord Hatherly in Ashbury Railway Carriage & Iron Company v. Ricke, between the exercise by a corporation of a power not conferred upon it, varying from the objects of its creation as declared in the law of its organization, of which all persons dealing with it are bound to take notice, and the abuse of a general power, or the failure to comply with prescribed formalities or regulations in a particular instance, when such abuse or failure is not known to the other contracting parties."

No doubt a person dealing with a corporation who finds the making of a contract to be within the scope of the corporate powers under the charter, has a right to assume that its officers in the management of its affairs have complied with all the conditions necessary to the exercise of the power. If the contract with the corporation can be valid under any circumstances, an innocent person has a right to presume the existence of such circumstances. In such cases the corporation and its stockholders may be estopped from avoiding the contract or denying the existence of the requisite conditions.

This is the extent to which the cases cited go, and none of them hold that there can be an estoppel where the contract could not under any conditions be made by the corporation. To so hold would be equivalent to saying that a corporation could make any contract in excess of its powers

and in violation of the laws and policy of the State for no other reason than because it had made such contract. A usurpation of power where the other contracting party had full notice of the illegality of the act would operate under such a rule to confer power. We do not think that such a rule could prevail.

It is suggested that this contract might be operative to confer upon bondholders an equitable right to vote the shares of stock, but it is sufficient to say respecting that claim that such was not the contract. The contract was that they might vote as bondholders, and there was no intention of depriving stockholders of the right to vote. The judgment will be affirmed.