Solon H. Wilhelm and Sidney S. Wilhelm v. Edwin Byles and Edwin J. Phelps, Assignees of Kellogg, Sawyer & Co., et al.

*Assignment for the benefit of creditors—Any creditor may file bill to enforce trust, under How. Stat. secs. 8744-9—Other creditors not necessary parties—Assignors cannot carry on assigned business—Assignment puts an end to the same—Duty of assignees to convert property into money and apply same to payment of assignor's debts —Sales on credit—If authorized in assignment, renders it void as to creditors.*

1. Under How. Stat. secs. 8744, 8749, it is competent for *any* creditor to file a bill against the assignees of an insolvent debtor to enforce the prompt and faithful execution of the trust; and to this end *other* creditors have no opposing interests, and are not necessary defendants; nor need they be joined as complainants, the statute authorizing *separate* action by *any* person interested.

2. There is no statute in Michigan authorizing the assignees of an insolvent debtor, by the consent of *all* or a *majority* of the creditors, to continue the assigned business, and, in the absence of statutory provisions, the duty of such assignees, and their conduct and management of the assigned property, are subject to the ordinary rules and principles which apply to trustees in analogous cases.

3. As a general rule, the effect of a general assignment for the benefit of creditors puts an end to the transaction of the debtor's business, as ordinarily conducted; and it is the duty of the assignees to convert the property into money without unnecessary delay, and apply the same to the payment of the assignor's debts.

4. Generally, the assignor cannot, in the deed of assignment, authorize the assignee to continue his business, either for the benefit of creditors or for his own benefit; and such attempts to control the discretion of the assignee, and the disposition of the property, have been condemned as fraudulent and void by the courts.

5. A lumbering firm made a statutory assignment for the benefit of their creditors, and at a meeting of a number of such creditors the assignees were instructed to keep the mill running, and pay the amount due on an outstanding contract for the purchase of pine timber, the creditors present agreeing to give the assignors an opportunity to effect a compromise, and in case of failure the assignees were to go on and sell the property. Acting under these instructions, the

assignees continued to prosecute the business, borrowed money to pay on the land contracts, and made sales of lumber on the usual credit.

*Held*, in a suit, brought by creditors who had not consented to any such action on the part of the assignees, for the enforcement of the trust, that, in no view of the case, consistent with sound principles, can the action of the creditors and assignees be sustained. That while the arrangement might be carried out with the *unanimous* consent of the creditors, any creditor not consenting has the right to have the trust enforced according to its terms and spirit, and a decree was entered for the complainants accordingly.

*Held*, further, that it is settled law in this State that assignees have no authority to make sales on credit, as has been done in this case.

Appeal from Kalamazoo. (Mills, J.) Argued February 10, 1886. Decided April 15, 1886.

Bill to enforce performance of trust by assignees of insolvent debtors. Complainants appeal. Decree reversed, and one entered according to prayer of bill. The facts are stated in the opinion.

*Charles F. Collier* and *F. A. Baker*, for complainants:

The assignees under a common-law assignment have no power to continue the business of the assignors. This doctrine is so well established that it is hardly necessary to cite authorities to support it. The question has been before the courts in a variety of ways, perhaps most frequently in cases where the assignment itself has given the assignees power to continue the business and to sell on credit, etc.; but the courts have held, with great uniformity, that the assignors are to close up the estate, and not involve it in further complications, and that they cannot continue the business, or otherwise use the assignment, to hinder and delay creditors.

As a general rule, the effect of a general assignment of a debtor's property is to put an end to the transaction of his business, as ordinarily conducted, and to the ordinary operations of purchase, manufacture, and sale: Burrill on Assignments (4th Ed.) § 396, p. 600.

A trust of assets or property for creditors of itself suggests specific and well-defined obligations on the trustees. They are to hold and take care of, sell and dispose, the property, so as to convert it with convenient speed into money, and distribute and pay the proceeds to those entitled: *Forbes v. Scannell*, 13 Cal. 287; *Dunham v. Waterman*, 17 N. Y. 9;

*Duffy v. Logan*, 35 Id. 187; *In the Matter of the Accounting of Dean*, 86 Id. 398; *Hitchcock v. Cadmus*, 2 Barb. 381.

An assignment authorizing the sale of the assigned property on credit, is void as to creditors: *Nicholson v. Leavitt*, 2 Seld. 510; *Burdick v. Post*, Id. 522; 52 Md. 211; *Richardson v. Marqueze*, 59 Miss. 80; *Sutton v. Hanford*, 11 Mich. 513; *Ryerson v. Eldred*, 18 Id. 12–15; *Richardson v. Rogers*, 45 Id. 591.

The position we take in this case has been quite recently sustained in a case in Illinois, and another in Rhode Island, involving the same assignment. We call attention to the opinions in these cases, and the authorities cited: *Gardner v. Com. Nat. Bank*, 95 Ill. 298; *Gardner v. Com. Nat. Bank*, 13 R. I. 155.

There are no statutory provisions in this State changing the common-law rule and authorizing the continuance of the business. The assignment law of 1879 is not a law to provide for assignments for the benefit of creditors, but merely *regulates* common-law assignments for that purpose; and where no provision is made by the act, the common law still governs. The act of 1879 is not an insolvent or bankrupt act like that of 1883, which was held invalid by the Supreme Court: *Risser v. Hoyt*, 53 Mich. 185.

The other creditors of the assignors are not necessary parties to the bill. The statute authorizes *any* person interested to file his bill for the enforcement of the trust "in case there shall be any fraud in the matter of the assignment, or in the execution of the trust," etc. How. Stat. §§ 8744, 8749, gives the circuit court in chancery supervisory power, etc.

*Edwards & Stewart*, for defendants:

The bill of complaint is fatally defective, for want of necessary parties defendant, to enable the court to make a decree upon the subject-matter of the litigation; and a proper time to urge this objection is upon the hearing, and it need not be presented by plea or demurrer: Story Eq. Pl. § 75. For an elucidation of the principle applicable to the question of who are necessary parties where numerous persons are interested in the subject-matter of litigation as creditors and as trustees, see *Richardson v. Larpent*, 2 Younge & Coll. New R. 507, 512, 514, citing Story's Eq. Pl. note to § 135b.

The rule in equity is elementary that all persons *materially* interested in the subject-matter of the litigation should be before the court: Story's Eq. Pl. §§ 72, 102, 149, 157, 207, 216; *Hallett v. Hallett*, 2 Paige, 15; *Egberts v. Wood*, 3 Id.

517 ; *Wakeman v. Grover*, 4 Id. 23 ; Adams Equity, 312 and note ; 1 Daniell's Ch. Pr. 229, 230, and note.

Where an assignor is conducting a manufacturing business, with a large amount of material on hand to be manufactured, the assignees can carry on the business: Burrill on Assignments (2d Ed.) 490–1 ; *Woodward v. Marshall*, 22 Pick. 468 ; and the assignees may continue the business, with the express consent or approval of the creditors: *Mussey v. Noyes*, 26 Vt. 462 ; Burrill on Assignments (2d Ed.) 491.

The employment of the assignors at a salary to assist in conducting the business, was proper: *Baldwin v. Buckland*, 11 Mich. 389 ; *Clark v. Craig*, 29 Id. 401.

CHAMPLIN, J. Kellogg, Sawyer & Co. were engaged in the business of manufacturing and selling lumber. They owned a saw-mill, tram-way, a logging railway, and the necessary plant and appliances for sawing logs. They also held, under land contracts, fifty or sixty millions feet of pine standing timber, for which they owed upwards of $130,000.

Being embarrassed, and unable to meet their commercial paper and other obligations, the firm, on the ninth day of November, 1883, made a common-law assignment of all their property for the benefit of their creditors.

In making the assignment the parties observed the provision of "An act to provide for the regulation and enforcement of assignments for the benefit of creditors," approved May 13, 1879 (2 How. Stat. p. 2137).

A meeting of the creditors was held on January 23, 1884, at which quite a number of them attended, and it was voted "that the assignees should keep the mill running, and keep up signs of life at the mill; that they should pay the amount due on the Reed contract; that they should give Kellogg, Sawyer & Co. time to see what they could do in the way of effecting a compromise, and, in case they failed, * * we [the assignees] were to go on and try to sell the property."

The complainants have not consented to the carrying on of the business by the assignees. After the meeting of creditors the assignees made efforts to sell the property, and addressed circulars to persons whom they supposed might be willing to buy such property, but without avail. No meet-

ing of creditors has since been held. The assignees have ever since continued the business substantially as carried on by the assignors before the assignment. They borrowed $30,-000 to make payments on the land contracts, and have made other loans, the whole aggregating $37,500, the same being due from them for money borrowed. They have also found it necessary to contract other indebtedness in purchasing merchandise, supplies, and property needed in the conduct of the business, and the total indebtedness of the assignees, June 30, 1885, was $59,185.31, as shown by a report furnished by the assignees on the hearing of this cause and by the testimony of Mr. Phelps.

The assignees have also found it necessary in selling the lumber manufactured by them to make sales on credit, usually receiving 90-day paper, as is customary in the lumber trade.

The amount of credit so extended to purchasers by the assignees, and outstanding June 30, 1885, was $25,189.95 in ledger accounts and $27,326.53 in bills receivable, of which $13,088.79 had been discounted at banks.

It appears that the assignees have cut between one-third and one-half of the standing pine timber, and that they intend continuing their logging and sawing operations until they cut all the timber and manufacture it into lumber. They expect to complete the work in 1887.

It appears that there is no other pine timber tributary to this saw-mill, and when the timber belonging to the estate is consumed the mill will have to be dismantled, and the machinery and material disposed of for what it will bring. It is evident that it will take a year or more to close up the estate, after the assignees have ceased manufacturing lumber. The assignees claim that they are making a profit on the lumber they are manufacturing, and that creditors will realize more by having the business continued to the end than they would if it was closed out at once.

The complainants are creditors, who file their bill, setting up the facts, and asking that the assignees be perpetually enjoined and restrained from carrying on the business of cut-

ting, logging, and manufacturing into lumber the standing timber belonging to the estate of Kellogg, Sawyer & Co., and from carrying on and operating the saw-mill belonging to the estate ; also from carrying on the dry-goods business ; and from continuing the mercantile business of Kellogg, Sawyer & Co.; and from carrying on the farm belonging to the estate of Kellogg, Sawyer & Co.; and that the assignees be directed to sell and dispose of all the real and personal property of said estate without delay, and to convert the same into money, and pay the same to the creditors of said estate with all convenient speed.

The defendants answered the bill, and claimed that they were acting for the best interests of the creditors in carrying on the business, and with the approval of a large majority of them ; that the property could not be disposed of without great sacrifice in the condition it was in when it came to the hands of the assignees ; and they insisted that all of the creditors were necessary parties to a bill to enforce the trusts of the assignment.

Proofs were taken, and a decree entered in the court below dismissing the bill of complaint.

The point that the proper parties are not before the court is not well taken.

. Section 8744 of Howell's Statutes, relating to assignments, enacts :

" In case there shall be any fraud in the matter of said assignment, or in the execution of said trust, or if the assignee shall fail to comply with any of the provisions of this act, or fail or neglect to promptly and faithfully execute said trust, any person interested therein may file his bill in the circuit court in chancery of the proper county for the enforcement of said trust; and the court, in its discretion, may appoint a receiver therein."

And section 8749 provides that,

" The circuit court in chancery of the proper county shall have supervisory power of all matters, questions, and disputes arising under such assignments, except as otherwise provided in this act, and may, on the application of the assignee or any person interested, make all necessary and proper orders

for the management and disposition of the assigned property, the distribution of the assets and avails," etc.

Under this statute it is competent for any creditor to file a bill against the assignees to enforce the prompt and faithful execution of the trust. To this end other creditors have no opposing interests. It is not necessary, therefore, to make them defendants. The statute authorizes separate action by any person interested to compel performance of the trusts, and therefore other creditors need not be made parties complainant.

This brings us to the main question in controversy in this case, and that is, can the assignees, in their own discretion, or against the wish of creditors who do not assent thereto, continue and carry on the business in which the assignors were engaged?

In this State there is no statute authorizing the assignees, by the consent of the creditors or a majority thereof, to continue the business of the assignor; and, in the absence of statutory provisions, the duty of the assignees, and their conduct in their management of the assigned property, are subject to the ordinary rules and principles which apply to trustees in analogous cases.

As a general rule, the effect of a general assignment by a debtor of his property for the benefit of his creditors is to put an end to the transaction of his business, as ordinarily conducted, and to the ordinary operations of purchase, manufacture, and sale, as effectually as if the assignor were dead, and his property had passed to his administrator by operation of law, or to his executor by force of his last will.

It is obviously the duty of the assignees to proceed without unnecessary delay to convert the property assigned into money, and apply the proceeds to the payment of the debts. In the management and care of the property they are bound to use the same care, and exercise the same degree of prudence and caution, that a prudent man would with his own property.

As a general proposition, the assignor cannot, in the deed of assignment, authorize his assignees to continue and carry

on the business, either for the benefit of creditors or for his own benefit; and such attempts to control the discretion of the assignee and the disposition of the property have generally been condemned as fraudulent and void by the courts; for if held valid, then the courts must enforce them, and the spectacle might occur of a debtor holding his creditors at bay indefinitely, while subjecting his property to the risks of business, and placing it in position where the whole estate might be lost in the attempt to continue and carry on the business. The law ought not to tolerate any such interference in the management and disposition of assigned property by the debtor.

And if it cannot be done by the direct act of the party in the instrument of assignment, much less can it be done in the absence of any such provision. The assignee cannot substitute his discretion for that of the assignor, and hinder and delay creditors while he carries on the business, and speculates upon the chances of making or losing in the conduct of the business in which his assignor failed, at the expense and risk of the creditors. His duty is to apply the assets to the payment of the debts, not to the purchase of new material, or paying the expenses of a going enterprise, or pledging the property for the payment of liabilities incurred by himself.

The necessities of the case, where property comes to his hands in such condition that, in order to preserve it from destruction,—as, if a tannery were assigned and hides were in vats in process of tanning, or where articles are in process of manufacture, and only a comparatively small amount of work will prepare them for the market and render them salable,—will authorize the assignee, where it is manifestly for the benefit and advantage of the creditors and those interested in the estate that it should be done, to carry on the business for a limited time for the purpose of completing the manufacture of articles which, in their unfinished condition, have no salable value. This is within the ordinary duty of an assignee, and is no more than a prudent man would do in the management of his own property.

But such was not the case here. The pine timber had a

market value as standing pine. The saw-mill and other property can be sold in connection with, or separately from, the pine timber. The assignors have been and are employed in the running and management of the business at good salaries. The property of the insolvents which the assignees hold, or which was conveyed to them, for the purpose of paying the indebtedness, has been mortgaged to secure a loan of $30,000 to pay certain contract creditors who have sold pine lands to the assignors, thus securing a preference to them by incumbering the assets which ought to be applied in payment of all creditors ratably.

The manufacture of lumber requires that such lumber be sold. In the common course of the lumbering business such sales are made upon credit, and the assignees have sold upon credit to the amount of several thousand dollars.

It is settled law in this State that assignees have no such authority, and yet to carry on the business in which the assignors were engaged it is necessary that such sales should be made upon credit, in order to realize a profit in business.

There is no view which can be taken of this case, consistent with sound principles, which will authorize the assignees to continue and carry on the business. If the unanimous consent of the creditors was obtained it might be done, because none could complain ; but any creditor not consenting has a right to have the trust enforced according to its terms and spirit.

The decree of the circuit court must be reversed, with costs, and a decree entered here in accordance with the prayer of the bill.

CAMPBELL, C. J. and MORSE, J. concurred.

SHERWOOD, J. dissenting. Kellogg, Sawyer & Co., the assignors of defendants Byles & Phelps, on the ninth day of November, 1883, made a common-law assignment of their property to the latter, for the benefit of all their creditors. In doing so, however, they proceeded according to the provisions of the act of May 13, 1879 (How. Stat. p. 2137).

Their indebtedness at the time the assignment was made was about $326,000, and an additional contingent indebtedness, or rather liability, of about $106,000.

The assets consisted of real estate, standing pine timber, a steam saw-mill, lumber and lath, a tram-road and railroad, lumber camps, wagons, teams, and mill supplies, and all the equipments for doing a successful lumber business, if properly managed, amounting in value to about $500,000; and upon the lands held under contracts of purchase by the assignors was 53,000,000 feet of pine timber from which to obtain the logs to stock the mill.

At the time of the assignment the mill was in good running condition, and could be worked to the advantage of all the creditors until a reasonable sale of the property could be made. Moneys were coming due upon the contracts for the timbered lands, and, in some instances, installments were then past due. After a careful examination of the situation, made by the assignees on entering upon the discharge of their duties, it was ascertained that a forced sale of the property would result in a very great sacrifice, and it became a question of much importance to them, as well as to the creditors, what course, under all the circumstances, should be pursued by them in the proper discharge of their trust.

There was no immediate prospect of making a sale of the property, except they should force one, and the only alternative left was to run the mill and work up the timber until something reasonable could be obtained for the property. This course offered the promise of largely increasing the dividends to the creditors, and would rather tend to brighten the prospect for an earlier and more advantageous sale of the property. Something had to be immediately done to save the unpaid land contracts from forfeiture.

It was under these circumstances that the assignees called a meeting of all the creditors for the twenty-fourth day of January, 1884, and a large majority were in favor of stocking and running the mill until the property could be sold at some reasonable rate, and none have objected to taking this

course except complainants, who are creditors to the amount of about $4,000.

In pursuance of the desire and wish of the creditors, and in accordance with their own judgment, the assignees have kept the mill stocked from the timber on the estate's land, and have operated the mill, all the time using their best exertions to make a reasonable sale of the entire assigned property. From the record it appears about $131,000 was owing upon the contracts for the purchase of the land upon which the timber stood, and, for the purpose of saving these lands and the valuable pine timber from forfeiture, the assignees were obliged to hire $30,000, which they did, and thus secured to the estate said land and timber; that in doing this they did not imperil the estate, but saved and secured the principal part of its assets. The loan was made and confirmed under the authority of a court of equity having jurisdiction in the matter under the statute hereinbefore referred to.

The record further shows that, in addition to payments made from said loan, the assignees have paid upon said land contracts, as the same has become due, $15,000 more; that they have over 9,000,000 feet of timber on bond at the mill, worth, at a fair market value, $100,000, from which to pay the loan of $30,000, and to pay debts of creditors as soon as the sales can be made; and by far the larger portion of the pine timber stands uncut upon the lands; and if a forced sale should now be made of said lumber, a large and unnecessary sacrifice of the value of the same will have to be made.

The assignees further show, I think, very satisfactorily, that they are and have been disposing of all the property assigned to them as fast as it can be done to advantage to the creditors, and with a view of speedily closing up the estate; and that in no way can so much be realized for the creditors as by continuing to utilize the mill property and plant in converting this pine timber into lumber until a sale of the entire property can be made.

Just at this point, and at this stage of the proceedings and progress made by the assignees, the complainants in this case file their bill, asking the court to enjoin the assignees from

cutting any more timber, or using the mill property and plant for that purpose, and requiring them to make immediate sale of all the property of the estate, and convert the same into money,—substantially a forced sale of all the property.

The case was heard before Judge Mills, at the Kalamazoo circuit, who, after a patient and careful examination of the whole case, upon testimony taken showing the precise situation of the property and the conduct of the entire business by the assignees, made a decree dismissing the complainants' bill. The complainants appeal to this Court, and ask that the decree be reversed, and the relief prayed for in the bill granted.

My brethren, adopting the views presented by complainants' counsel, have decided to reverse the decree made by the learned circuit judge, and order a decree in accordance with the prayer of the bill.

After a careful examination of the situation, and the facts upon which this action is proposed to be taken, I am unable to concur in the views they have expressed or in the conclusion they have reached.

I think the decree made by the circuit judge was right, and ought to be affirmed.

The statute of our State (How. Stat. § 8744) relating to assignments, under which it is claimed the court may take the action proposed in this case, provides, among other things:

" In case there shall be any fraud in the matter of said assignment, or in the execution of said trust, or if the assignee shall fail to comply with any of said provisions of this act, or fail or neglect to promptly and faithfully execute said trust, any person interested therein may file his bill in the circuit court in chancery of the proper county, for the enforcement of said trust; and the court, in its discretion, may appoint a receiver therein."

Section 8749 of the same statute provides that,

" The circuit court in chancery of the proper county shall have supervisory power of all matters, questions, and disputes arising under such assignments, except as otherwise provided in this act, and may, on the application of the

assignees or any person interested, make all necessary and proper orders for the management and disposition of the assigned property, the distribution of the assets and avails, the recovery of all property claimed by third persons, and may from time to time require new bonds or sureties, who shall justify as herein provided."

Under this statute it is quite clear that it is competent for any creditor to file a bill against the assignees to enforce the prompt execution of the trust, and I agree with my Brother CHAMPLIN, "To this end other creditors have no opposing interests." But such a bill *is only proper* in case of neglect or refusal of the assignees to promptly and faithfully perform such trust, and whether they are so doing or not is, as in this case, not unfrequently a very important question,— one of great interest to all the creditors; and when the assignees, as in this case, have entered fully into the discharge of such duty, whether their action affects beneficially or prejudicially creditors, and whether or not such action shall be modified or changed, or discontinued altogether, are questions not unfrequently of the gravest concern to creditors; and I do not think the Legislature ever contemplated that they were, in passing the act referred to, authorizing a single creditor or firm or corporation to bring suit in such a case, and, without notice to any other persons than the assignors and assignees, secure such action by the court as may preclude or destroy all action taken or proposed to be taken by the assignees, however reasonable or beneficial it may be for the estate, and however much desired by every other creditor of the insolvents. I am not yet willing to give my assent to such a construction of the statute; certainly no such course was ever tolerable at common law.

When this assignment was made, and the property delivered thereunder to the assignees, each creditor, to the extent of his claim, owned a ratable proportion of the assets, and all were interested in their disposition in such manner as to obtain the largest amount that could be realized for the same, at the earliest moment possible consistent with a reasonable sale thereof; and the whole matter, in the first instance, is left to the discretion of the assignees, by the assignors and

creditors, both; and when it is sought by a legal proceeding to ignore the action of the assignees, and take that discretion away from them by the action of a court at the instance of a single creditor or firm, every other creditor becomes equally interested in such a legal proceeding, and is equally entitled to his day in court before action resulting in such a change can be had.

In such a controversy the assignees cannot be regarded as representing the interests of the various creditors. Neither the assignors nor the law casts upon them any such agency. Their participation in such a suit only extends to their own liability, and that of their bondsmen, in the premises, and upon those they must be heard. The interest of each creditor, in such case, becomes one of substantial right,—a right that cannot be changed, jeopardized, or affected by the action of the court until each has been heard, or had the opportunity to be heard.

The only parties made defendants in this case, aside from the assignees, are the assignors, whose interests are entirely contingent and subsidiary to those of the other creditors. Still it is proposed by the decree ordered by my brethren to bind every creditor of this insolvent estate (and there are many of them,—some to the amount of over $50,000) by the action of the court at the instance of a single creditor, and which may be the means of depriving them of many thousands of dollars, without even having been notified that such a proceeding was pending; and it is quite possible the complainant, in many cases, might have no other motive or object in view than to secure to himself an opportunity to bid off the property at a forced sale, and obtain thereby the advantage of the sacrifice usually attending such a disposition of the insolvent's property. It seems to me such a course is subversive of all law for the protection of property, and I am very sure the Legislature never intended any such construction of its enactments.

Each and every one of these creditors should, who were not plaintiffs in the case, have been made defendants, and brought into court by such service, actual or constructive, as

the law provides in other cases, before the decree ordered should be made. I think the rule contended for by the learned counsel for defendants in their brief is well stated when they say that, "in equity, all persons materially interested in the subject-matter of the litigation should be before the court; that this rule is elementary": Story Eq. Pl. §§ 72, 102, 149, 157, 207, 216; Adams Eq. 312, note; 1 Daniell Ch. Pr. 229, 230, note 1; *Patton v. Bencini*, 6 Ired. Eq. 204; *Hallett v. Hallett*, 2 Paige, 15; *Eyberts v. Wood*, 3 Paige, 517; *Wakeman v. Grover*, 4 Paige, 23; *Kimber v. Ensworth*, 1 Hare, 294; *Westcott v. Minnesota Min. Co.*, 23 Mich. 145; Mitf. Pl. 256; *Titus v. Minnesota Mining Co.*, 8 Mich. 183; *Gilham v. Cairns*, Breese, 124; *Greenup v. Porter*, 3 Scam. 64; *Prentice v. Kimball*, 19 Ill. 320; *Crocker v. Higgins*, 7 Conn. 342; *Williams v. Bankhead*, 19 Wall. 563; *Armstrong v. Pratt*, 2 Wis. 218.

I am aware it is said that an objection for want of parties is not favored if not taken until the hearing: *Holcomb v. Mosher*, 50 Mich. 252; but when complainants present a case arising from facts which necessarily show that there are other parties than those examined interested in the litigation, whose rights may be materially affected by the decree asked to be made, it then becomes the duty of the complainants to see that all such persons are properly made parties, and their omission to do so will furnish no occasion for the application of the rule suggested. Whether complainants aver, or do not aver, that they file the bill in behalf of themselves and other creditors, in a case where it appears that the other creditors are opposed to the litigation and the relief sought, will make no difference. The facts should always control the averments in pleadings in equity, and, if not stated correctly, the party pleading them must abide the consequences.

As this case stands upon this record, the firm creditor who files this bill cannot, under any circumstances, make the other creditors his co-complainants. In the action this firm has taken they place their interest, which was as one to eighty, in antagonism to the interest of all the rest of the creditors, and ask, substantially, that the interest of all the rest shall be

sacrificed or made subservient to theirs, for some reason which is entirely unapparent to me, upon the facts as they are given in the testimony. It is certain, however, that the other creditors could only be made parties to the suit by making them defendants. This should have been done: Adams Eq. 312, and note.

It will not do in this case to say that if other creditors are not joined as parties defendant it is no concern of these defendants; that such persons cannot be affected by the proceedings. This cannot be so.

This is a bill filed to perpetually enjoin the assignees from further proceedings in the performance of the duties of their trust in such manner as, in their best judgment, and in which all the other creditors except this complainant firm creditor concur, will be for the best interest of all interested in the insolvent estate. If the decree asked for is detrimental to that interest, no matter in what manner the complainants may be benefited by it, it is clear, if the other creditors and assignees are correct, they will be injured by it, because the management from which the estate is now deriving benefit is to cease.

Under the case, as it now stands, it is the duty of the assignee defendants to state the facts to the court, and ask that the other creditors may be brought in to speak for themselves before their rights shall be further jeopardized. This they have done, and is all they could do, in my judgment; and the complainants' bill should be dismissed, or the case removed to the circuit, with instructions to make the other defendants parties, to the end that the issue between the actual parties, viz., the complainants and all the other creditors, may be fully tried and disposed of according to the real equities of the case: *Richardson v. Larpent*, 2 Younge & C. 507, 512; *Gray v. Chaplin*, 2 Sim. & S. 267.

I now come to the second point in the case, which fairly raises the question whether or not the assignees in this case are justified, under all the circumstances as they appear in this record, in continuing the business of the assignors. I

think they are fully justified in doing all that they have done, and such was the opinion of the circuit judge.

They are men of ability, of good business capacity, and whose integrity is beyond reproach. The good faith of these men is not questioned, and no fraud is imputed. They have been active and vigilant in their efforts to properly discharge the trust, and the only question is, having been diligent in the business committed to their charge, and acted upon their best judgment in the premises, and in accordance with the judgment of all the creditors, save the complaining firm, will the law sustain their doings? My brethren think not, and I cannot agree with them.

As to the general rule, I concur with them, and I agree with my Brother CHAMPLIN that "it is obviously the duty of the assignees to proceed without unnecessary delay to convert the property assigned into money, and apply the proceeds to the payment of the debts. In the management and care of the property they are bound to use the same care, and exercise the same degree of prudence and caution, that a prudent man would with his own property;" and the same statute which allows the plaintiffs in this case, authorizes the circuit judge " to make all necessary and proper orders for the management and disposition of the assigned property;" and my learned brother admits that, with the consent of all the creditors, the assignees might lawfully do all they have done.

It is conceded, then, and I think it must be by all, that there are exceptions to the general rule. This being the case, a large discretion must necessarily be left with the assignee. This was so at the common law, and that the statute contemplates the use of such discretion is clearly apparent in the fact that a supervisory power over its use is given to the circuit court, in chancery, in the proper county; also in the fact that the assignees are required to give bonds for "the prompt and faithful administration of the trust," in a sum double the value of the assigned property: How. Stat. § 8740. That the assignee may, under certain circumstances, conduct the business for a time which was being

carried on at the time the assignment was made by the assignors for the benefit of the estate and creditors, is, I apprehend, well settled, both upon reason and authority : Burrill Assignm. 490, 491; *Woodward v. Marshall*, 22 Pick. 468; *Mussey v. Noyes*, 26 Vt. 462; *Patten's Estate*, 2 Pars. Sel. Cas. 108.

I know of no degree of caution, care, or prudence which permits a person, as my trustee, to sell and dispose of my property at a sacrifice of one-third or half of its value, unless compelled so to do; and there is no such necessity resting upon assignees ; neither ought such action to be tolerated by courts. And I do not think it lies in the power of a creditor who holds a claim to the amount of only one-eightieth part of the indebtedness against the estate to defeat the action of the assignees, when their management of the insolvent's assets is for the best interest of the insolvent estate; and I know of no law or decision which will allow the judgment, wishes, or desire of such a creditor, through the action of any court, to usurp the functions of the assignees to the extent claimed, unless it shall be made in this case, and which I think ought not to be done.

It is true, as is said by my brethren, that the law does not allow the assignors to provide in the assignment for a continuance of the business; but that is not because a continuance may not be needful for the time being, and for the best interest of the estate, but because the action and direction of the assignors in the business is one of the things to be gotten rid of in making the assignment. It has no connection with what may or ought to be done in the future by the assignees.

No statute is necessary to authorize the continuance of the business for such time as may be necessary to close up the estate for the best interest of the creditors. The fact that the law requires the exercise of good judgment and business management in controlling the assets is sufficient authority upon that point. Each case must depend upon its own circumstances as to the course proper to be pursued, and the rules which should govern in closing up an estate con-

sisting of a thousand dollars' worth of dry goods or groceries, which may be disposed of in a week, and which are continually depreciating, are not to be applied to an estate valued at a half million dollars, consisting of large tracts of valuable pine timber and farming lands, constantly increasing in value, with a saw-mill worth $40,000, and tram-ways and railroads connecting the two, and large quantities of lumber on bond to be sold, the entire estate requiring at least three or four years in which to dispose of it to any advantage to the estate, as in the present case ; and no prudent business man would think of giving the two cases the same treatment.

It is true pine timber and pine lumber have a market value in the regular course of trade in that business; but can any one say the saw-mill and its equipments, the tramways and railroads, have, or that any or either, or all of them together, with the pine timber and lumber included, have, when disposed of at forced sale for costs? I know of no such market value; neither am I furnished with such information by the record. But very few persons are prepared to purchase that kind and amount of property for cash, at any price, even such as might be obtained at syndicate biddings. I do not think it would be the exercise of good judgment or good management to dispose of such property in such manner, and these assignees have not done it.

It was good management, in my judgment, for the assignees to hire money and redeem the pine lands (in which consisted the bulk of the assets of the insolvent estate) from forfeiture, and I think this is clearly shown by the testimony ; and I am unable to find from the record that any of the assets have been applied to the payment of any indebtedness except that which, under the assignment and the law as it now stands, would be required to be paid in full; and it does appear, I think, very clearly, that the estate applicable to the payment of all the *pro rata* creditors has been largely increased by the course pursued by these assignees.

Upon the merits of the complainants' case, as presented, I

fail to discover any good reason why the action of these assignees should be interfered with. On the contrary, I think they have used their judgment and discretion wisely, and in a legal and proper manner. But little over two years had elapsed when this suit was commenced. The doings of the assignees have been open to all parties interested in this estate. A large number of creditors have undoubtedly watched closely all that has been done, and it seems a strange thing, indeed, that the complainant firm is found to be differing with all the rest of the persons in anywise interested in the property and its management. Only one thing is more astonishing to me, and that is upon the face of this record my brethren feel impelled to accede to the views of the complainant. In my judgment, a reasonable time has not yet elapsed within which this estate should be closed, against the advice and judgment of both assignees and assignors, and all the other creditors, except this one, whose interest is secured by an unquestioned bond, and the extent of which is only one-eightieth part of the amount to be eventually distributed.

Where neither fraud nor bad faith is imputed, and no mismanagement of the assets is shown, I do not think, under the circumstances of this case, courts have any right to interfere or attempt to control the action of the assignees, and the decree of the circuit judge should be affirmed.