QUIMBY v. UHL.

1. ASSIGNMENTS FOR BENEFIT OF CREDITORS—CONTINUING BUSINESS —ESTOPPEL.

An assignee under a common-law assignment may continue the business with the consent of the debtor and all the creditors, and in such case they will be estopped from claiming that he should have disposed of the property, paid the debts, and turned over the remainder to the assignor.

2. SAME—PAYMENT OF DEBTS.

When an assignee has paid all the debts, the assignor may take possession of the remaining property, and no retransfer is necessary to convey title to him; or, the trust being at an end as to the creditors, he may arrange with the assignee to continue the business in the name of the assignee.

3. SAME—ACCOUNTING—LOSSES.

An assignee, acting in good faith, with the consent of all the creditors and the assignor, continued the business under the management of the assignor. After the debts were paid, he continued the business with the consent of the assignor, giving his advice and extending credit. After the death of the assignor, the business was continued in the same manner, with the consent of the heirs of the assignor, some of the heirs being active in the management of the business. For the first 14 years the business was successful, and yielded large profits; for the last six years it was unsuccessful, and sustained losses; for the whole period the profits exceeded the

losses. *Held*, that a bill by the heirs of the assignor, who had received and retained the profits of the business when successful, attempting to cast all the losses upon the assignee, was without equity and unconscionable.

4. Trustees—Management of Property by Consent.
   Beneficiaries of full age and sound mind, who have expressly or impliedly assented to the action of their trustee in the management of the property, will be held to have acquiesced in such action.

Appeal from Kent; Wolcott, J. Submitted. January 10, 1902. (Docket No. 63.) Decided March 26, 1902.

Bill by Emeline K. Quimby, Ethelyn G. Quimby, Clara S. Morley, Walter W. Drew, as administrator of the estate of Ichabod L. Quimby, deceased, and Clara S. Morley, as administratrix *de bonis non* of the estate of George I. Quimby, deceased, against Edwin F. Uhl, individually and as assignee of Ichabod L. Quimby, and Raymond L. Quimby and Irving L. Quimby, for a receiver and an accounting. There was a decree for defendants, and complainants appealed. Defendant Uhl having died, his executrix, Alice F. Uhl, was substituted as defendant. Affirmed.

In August, 1879, the defendant Uhl was appointed assignee, by a common-law assignment, of the assets of Ichabod L. Quimby. The business was carried on from that time until 1899 in the name of Mr. Uhl as assignee. The debts which then existed at the time of the assignment were all paid. The business was for many years prosperous, but in the depressed times commencing in 1893 it suffered losses. The statement of facts covering so long a period is necessarily lengthy. We do not think we can state them more clearly or more concisely than has been done in the opinion of the learned circuit judge who heard the case. That opinion is as follows:

"For some years prior to July 31, 1879, Ichabod L. Quimby and his son, George I. Quimby, had been engaged in a lumbering and manufacturing business at

Grand Rapids and elsewhere under the name of I. L. Quimby & Son. On or about that date George I. Quimby conveyed to his father, Ichabod L. Quimby, all his individual property and his interest in the firm, and on August 6, 1879, Ichabod L. Quimby made a common-law assignment for the benefit of his creditors to the defendant Edwin F. Uhl, who formally accepted the trust. The liabilities of I. L. Quimby at that time amounted to about $41,000, and the assigned property consisted of a mill and the surroundings in Grand Rapids, some property at Cherry Grove, a mill at Quimby Station, and some other property, much of which was heavily mortgaged.

"After the assignment, the business formerly conducted under the name of I. L. Quimby & Son was continued to be carried on in the name of Edwin F. Uhl, assignee of I. L. Quimby, but under the personal management and direction of Ichabod L. Quimby and his son, George I. Quimby, both of whom were experienced and capable business men. The moneys derived from the conduct of the business were deposited in the bank account in the name of Edwin F. Uhl, assignee of I. L. Quimby, and from 1879 to 1893, checks were drawn thereon, signed by George I. Quimby, as follows: 'Edwin F. Uhl, by George I. Quimby, Assignee of I. L. Quimby.' The purchase of supplies and materials, the manufacture and sale of lumber and products, were made by the Quimbys in the name of Edwin F. Uhl, assignee of I. L. Quimby; and the business generally was carried on in that name and in that manner, with the knowledge and approval of the assignee and I. L. Quimby.

"In the year 1882 I. L. Quimby had inspected a tract of valuable pine timber, known as the 'Dexter & Noble Tract,' which he was desirous of purchasing. The defendant Uhl secured the purchase price of $20,000, raising a portion of it at the bank by indorsing a note with George I. Quimby, and giving his own notes for the balance. The title to this property was taken in the name of Edwin F. Uhl. In the year 1885 another purchase of timber land was made in substantially the same manner. This was known as the 'Hannah & Lay Purchase,' and for this property $10,000 was paid. The money was raised by Mr. Uhl on his personal indorsement, and the title taken in his name. In 1886 another purchase, known as the 'Torrent & Hannah Purchase,' was made for the sum of $20,000. The purchase money was secured by Mr. Uhl in the same

manner as in the other purchases, and the title taken in his own name.

"These several tracts were lumbered off by the Quimbys. The mill belonging to I. L. Quimby at the time of his assignment, and then located at Cherry Grove, was removed to South Boardman, and there operated. It was occupied for the most part in cutting the timber from the three purchases referred to. The manufacturing business carried on at Grand Rapids was also extended and enlarged during this period. The purchase of these timber lands proved to be a profitable investment. The purchase price of the lands was paid; the debts existing at the time of the assignment were all paid by 1887; and on the death of I. L. Quimby, in March, 1889, the estate was in good condition, having on hand quite a large surplus over and above all indebtedness contracted since the assignment.

"In 1887, after the payment and discharge of all the debts existing at the time of the assignment, the business was still carried on in all respects as before,—in the name of Edwin F. Uhl, assignee of I. L. Quimby. Ichabod L. Quimby and George I. Quimby continued as the active managers of the business, and Edwin F. Uhl took little active part in the conduct of the business, other than by way of providing for the purchase of the timber lands before named, and in the indorsement of negotiable paper at the request of the assignor or his son, and in giving legal advice and counsel to I. L. Quimby and his son, George, concerning the business.

"Ichabod L. Quimby died in March, 1889, and left surviving him his widow, Emeline K. Quimby, and his children, George I. Quimby, Clara S. Morley, and Ethelyn G. Quimby. No administration was taken on his estate. After his death no change was made in the conduct of the business, except that George I. Quimby assumed the active management, and the assignee continued to furnish his personal indorsement on negotiable paper, and continued to act as general adviser; business still being carried on in the same name. The business then included the operations of the mill at South Boardman, and the conducting of quite an extensive manufacturing business at Grand Rapids.

"On May 15, 1893, George I. Quimby died intestate, leaving a widow, Bertha C. Quimby, and two minor children, the defendants Raymond L. Quimby and Irving L. Quimby; they being the children by a former wife.

On the death of George I. Quimby, the defendant Uhl caused an inventory of the property to be taken, and had the books of account examined by expert accountants. The inventory and appraisal showed at that time a total of assets belonging to the estate, including the real estate, of $97,474.75. Of this, $58,199.75 was the appraisal value of the personal property, including accounts and bills receivable, lumber and manufactured products, and all personal property. The entire indebtedness at that time was $31,886.80. No inventory was taken at the time of the death of I. L. Quimby, but the condition of the estate at that time was about the same as at the death of George.

"After the death of George I. Quimby, Clara S. Morley, one of the daughters, who had been employed in the office for a few years under her brother, George, requested Mr. Uhl to allow her to take charge of the business. She did so, receiving a salary of $50 per month. From that time the business was conducted as before, Mrs. Morley taking the place which George had taken before his death in the general oversight and active management of the business. New books were opened and kept at the Quimby office by a bookkeeper employed for that purpose. The customers were advised that the business would be continued the same as before. Mrs. Morley purchased the material to keep the factory in operation. She sold the manufactured product, making frequent trips for that purpose. She enlarged the business by entering into other branches not before carried on. She superintended the employment and discharge of the workmen, and gave all the details of the business her close personal attention. When she assumed the management of the business she was not familiar with the manufacturing business, excepting what she had learned in the office of her brother, George, and her duties there were mainly clerical in character. The operations in the factory at Grand Rapids were left in charge of the same foreman who had been employed there for many years, and the operations at the South Boardman mill were also left in charge of the same foreman who had been employed there during the lifetime of I. L. Quimby.

"For about six months after the death of George I. Quimby, Mr. Uhl signed all checks drawn in the conduct of the business, and these checks were drawn against the funds belonging to the business, deposited in the name of Edwin F. Uhl, assignee of I. L. Quimby. He also in-

dorsed as assignee for a deposit of all checks and bills receivable which came in from customers, and was in frequent communication with Mrs. Morley concerning the details of the business.   He also became personally responsible by indorsement from time to time for various sums necessary to carry on the business and pay outstanding obligations.   The amount for which he became thus personally liable increased during the last few years.   In December of that year [1893] Mr. Uhl went to Washington, and remained there until December of 1895, when he went to Germany, and remained there until August, 1897.

"During the conduct of the business in the name of the assignee, there was purchased from time to time, with trust funds, certain real estate.   In some instances the titles were taken in the name of Edwin F. Uhl individually, in other instances in his name as assignee, and in others in the name of George I. Quimby.   In still other instances lands were purchased on contracts in the name of Edwin F. Uhl individually, and assigned by him to George I. Quimby in 1892, and deeds made to the latter.   At the death of George I. Quimby, the personal property, consisting of cash, bills and accounts receivable, lumber and other manufactured products, amounting in value to upwards of $54,000, stood in the name of the assignee.   The real-estate titles were as follows:  All the Grand Rapids real estate, consisting of four lots, upon which are situated the factory buildings, the homestead, and two small dwellings, stood in the name of George I. Quimby, in whose name they had been repurchased in 1888, after the foreclosure of a mortgage upon them; all of the purchase price, together with the taxes and other disbursements relating to them after the purchase, having been paid from the trust funds, and the mortgage given by George I. Quimby for a part of the purchase price having in 1894 been paid by George I. Quimby's administrator out of certain life-insurance money belonging to his estate, and the mortgage having been assigned to Ethelyn G. Quimby; the payment and assignment having been made by the direction of Edwin F. Uhl.   A tract of hard-wood land, consisting of an entire section, in Kalkaska county, purchased in 1891 with trust funds, stood in the name of George I. Quimby, as did also two village lots in the village of South Boardman, and about 550 acres of stump land in Wexford county.   A large amount of lands in Kalkaska county, purchased with trust funds, stood in the name of Edwin

F Uhl individually, and five lots in South Boardman, and the mill site on which was the South Boardman mill, stood in the name of Edwin F. Uhl, as assignee of I. L. Quimby. An abandoned mill site in Canada stood in the name of Ichabod L. Quimby, and this was the only property which did stand in his name, although all of it was equitably the property of his estate.

"Soon after the death of George I. Quimby, an administrator of his estate was appointed at the instance of his widow, and the administrator and the widow of George I. Quimby claimed ownership and control of the property standing in the name of George I. Quimby, and continued to make such claim until March, 1894, when a settlement was made with George I. Quimby's widow, by which, in consideration of $5,200, she conveyed to Clara S. Morley all her right, title, and interest in her husband's estate. This settlement had the knowledge and approval of Edwin F. Uhl, who had taken no steps to have the titles corrected, who acted as the family adviser in respect to the settlement, and who required, as a condition to its being made, the resignation of the administrator of George I. Quimby's estate (he having sought to interfere with the conduct of the business of the assignee), and the appointment of Clara S. Morley as administratrix *de bonis non*. Out of the $5,200 paid to the widow of George I. Quimby, $200 was from the trust funds, and $5,000 was money loaned by Edwin F. Uhl, as guardian of John T. Byrne, upon a note of Emeline K. Quimby, Clara S. Morley, and Ethelyn G. Quimby, secured by an instrument purporting to mortgage 'all the real estate and chattels real, and all the goods, chattels, moneys, and debits owing to Edwin F. Uhl, assignee of I. L. Quimby, and all the right, title, and interest, claim and demand, of, in, and to all the personal and real estate now vested or held or standing in the name of Edwin F. Uhl, assignee of I. L. Quimby, wheresoever the said real estate, chattels real, or personal property may be.'

"During Mr. Uhl's absence in Washington, the checks drawn in the course of the business were signed as agent of the assignee, but all drafts and bills receivable from customers, and all drafts drawn upon customers, were sent to him for his signature; the business being all done in his name as assignee, as before. He received frequent communications from Mrs. Morley concerning the conduct of the business, and advised with her as to its manage-

ment. By his direction, Mrs. Morley, during his absence in Washington and Germany, looked to his son, David E. Uhl, for assistance in the conduct of the business,—the son acting as his father's agent; and while Mr. Uhl was in Germany the drafts and bills receivable from customers, and the drafts drawn upon customers, were indorsed and signed by David E. Uhl, as the assignee's agent. During the same time, trial balances and other statements concerning the business were furnished to David E. Uhl by Mrs. Morley, and were transmitted by him to Edwin F. Uhl. In July, 1896, an inventory was taken of stock on hand, and it was found that there had been a loss from 1893 of about $12,000. This situation was reported to E. F. Uhl, who was then in Germany. In January, 1897, the inventory taken showed that during the year 1896 the business had lost between $5,000 and $6,000. This fact was communicated to Edwin F. Uhl.

"In August, 1897, Mr. Uhl returned from Germany, and thereafter gave more personal attention. In July, 1898, another inventory was taken and reported to Mr. Uhl, who was then residing in Grand Rapids, which showed an additional loss of $19,000. In July, 1899, another inventory showed a still further loss of about $9,000; and no change was made in the conduct of the business, except that in July, 1899, under the direction of Mr. Uhl, the name under which the business had been carried on was changed, and the business was thereafter carried on in the name of I. L. Quimby Factory. During that year Mr. Uhl became personally liable on his indorsements for money used in the management of the business to the sum of about $13,000. This was for indorsements at the bank for money borrowed. He also personally guaranteed a number of claims for goods and materials furnished the concern, which were unpaid and pressing for payment. This amounted to about $3,000. He also became personally liable for the overdraft at the bank, which amounted on November 24th to $1,600.

"The bill of complaint in this case was filed on November 25, 1899, asking for the appointment of a receiver. A receiver was appointed in December, 1899, and his inventory and appraisement showed debts amounting to about $50,000, with total assets of about $46,000. Mr. Uhl drew from the estate, during the period in which he was acting assignee, an annual salary of $1,000. It appears from the evidence that I. L. Quimby desired that the business should be continued in the name of Edwin F. Uhl as

assignee, even after the entire indebtedness owing at the time of the assignment had been paid. It appears that the same thing was true of George I. Quimby, who was the active manager from the time of his father's death to his own death. The residence of the Quimby family was in the near neighborhood of the factory in Grand Rapids, and after George's death the family was composed of Emeline K. Quimby, the widow of I. L. Quimby, Mrs. Morley, and Ethelyn G. Quimby; and, after the settlement with the widow of George I. Quimby, the two children of George I. Quimby, the defendants Raymond L. and Irving L. Quimby, also made their home with the Quimby family. It appears from the books of the concern that Emeline K. Quimby drew and had charged to her personal account the sum of $39,417.61 from 1879 to 1899. It also appears from the books that George I. Quimby drew from the business, from the time of the assignment to the time of his death, as appears charged to him on the books, $31,642.35. It also appears from the books that Mrs. Morley, from the time of George's death to the date of the appointment of the receiver, drew out and had charged to her personal account the sum of $6,681.92.

"This bill is filed on the theory that by law, and by the terms of the deed of assignment, the assignee had no authority to continue the business as a going business, but his duty was to convert the assets into money as rapidly as possible, and to divide the proceeds among the creditors, and to return the balance of the estate, if any, to the assignor. This was unquestionably his duty, and had he done so at once, and as rapidly as possible, without further purchases of property or extending the business, it is apparent that the assets would no more than have paid the debts, and probably would not have done that; but, with the consent of all the creditors and assignor, it would not be unlawful for the assignee to continue the business as a going business. If all who were beneficially interested in the trust fund, and who were under no legal disability to act, gave express or implied consent, there would then be no one else who would have any right to complain, and the assignee, acting in good faith under such authority, would be protected. So far as appears in this case, the continuance of the business by the assignee up to the time, in 1887, when all the original debts of the assigned estate were paid, was with the acquiescence of all the creditors. There was after that time, and until his death, no one beneficially interested in the trust, except the

assignor, Ichabod L. Quimby. It appears that the continuance of the business by the assignee from 1887 up to the time of the death of I. L. Quimby was with his express consent, or at least with his acquiescence. The business was then profitable and successful, and was providing a means of support for I. L. Quimby and his family, and was accumulating an increasing surplus.

"There can be no question but what I. L. Quimby could authorize a continuance of the business as before in the name of Edwin F. Uhl, assignee. It was under his own immediate supervision, and that of his son, George; and he had the benefit of the name of Edwin F. Uhl, his advice and counsel, and his financial aid as indorser. This does not seem to be seriously questioned in this case by counsel for complainants. At the death of I. L. Quimby, intestate, the estate belonged to his widow and children. Of his children, all were of age except Ethelyn, who was then about 19. The family were living together. George was a capable business man, and was thoroughly familiar with the details of the business, and during the latter part of his father's life had practically had the management of the business. The business was successful and prosperous. It seems to have been taken for granted that it should continue as before. The family apparently relied on George, and he continued as the active manager until his death, in 1893. Up to this time the business had been successful. No complaint was made by any one. There was a net estate of about $65,000. The management of the business in the name of the assignee, and at least under his nominal control, seems to have had the entire acquiescence of all the family. The following six years were years of disaster and loss, and it is for this period that it is claimed the assignee should account.

"If those beneficially interested in the estate, and under no legal disability, and with the knowledge of the estate and of their rights therein, acquiesced in the continuance of the business as before, in the name of and under the direction of the assignee, and if the assignee acted in good faith and with reasonable care and judgment, they cannot now complain. Except the two minor children of George, the other heirs of I. L. Quimby were of age. His widow was for a time much disturbed, mentally and physically, over the death of George, but she had at no time, apparently, been consulted as to business affairs; and it appears

that she left all such matters to her husband and George during their lifetime, and later to her daughter Mrs. Morley. She was living with the family during all this time, was receiving $100 per month from the estate for the support of the family, and after her recovery she was so situated that she knew, or might have known, all that Mrs. Morley knew of the situation as regards the estate. As to Ethelyn, she was, at the death of George, a member of the family, and so continued, though she seems never to have been personally consulted as to the conduct of the business. Mrs. Morley was the active manager of the business after the death of George. She was a woman of energy and good business capacity, and gave to the business her best efforts.

"The losses in 1893 and succeeding years were due in great part to the financial panic and general business depression, and to some extent, probably, to the fact that the work in the factory in getting out the product was left to the foreman, and on account of inadequate machinery and appliances in some instances, and the lack of close attention to businesslike methods by those in control in the factory in other instances. The cost of the product of the factory was greater than it should have been. With this portion of the work Mrs. Morley was not familiar, and it was left in the hands of the foreman in charge. There were comparatively few losses from bad debts. Mrs. Morley knew better than any one else the condition of the business, and whether it was prosperous or otherwise. She may not have known fully the legal rights of the heirs and the legal duties of the assignee, but there was no evasion or concealment on the part of the assignee; and it was clearly her wish and desire to have the business continue in the name of Mr. Uhl, and to so manage it herself as to make it a success. This appears in many of her letters. I think it must be said from all the evidence that Mrs. Morley knew the situation of the estate, and knew, or might have known, the rights of the heirs therein, and the relation of the assignee thereto, and that her acquiescence in the continuance of the business by the assignee estops her from now complaining. The same must be said of Emeline K. Quimby and Ethelyn G. Quimby. They apparently knew little of the actual conduct of the business; but they lived close to the factory; they knew it was conducted in the name of the assignee; they were in the same family with Mrs. Morley; they knew that from the receipts of the business there were drawn monthly the necessary funds for

the support of the family; and, if they did not know all that Mrs. Morley knew about the business, it was apparently because they accepted the situation as a matter of course, and depended on Mrs. Morley, and acquiesced in what she and Mr. Uhl did, without question.

"I do not find that the assignee acted throughout this business at any time in bad faith. He made no new or speculative investment of the trust funds, but continued a business which was well established, and which had been successful and prosperous. The trust funds, while nominally in his control and direction, were embarked in a business which was at all times managed by I. L. Quimby, George I. Quimby, or Clara S. Morley.

"A somewhat different question is presented as to the minor children of George I. Quimby; assuming that the assignee had, by reason of the acquiescence of the adult members of the Quimby family, authority to continue the business up to the time of the death of George I. Quimby. At that time the rights of the infants attached, and as to them the assignee's right to continue the business for a longer period than was necessary to close it out must depend upon a new consent as to the infants, given after George I. Quimby's death. No temporary operation of the business for the purpose of closing it out was apparently ever contemplated, and the question is, Was the consent of the infants to a continuance of their estate in the business obtained in any manner so as to affect their rights in the estate?

"At the time of the death of George I. Quimby, the defendant Raymond Quimby was about eleven years of age, and Irving Quimby about six. The question of their rights in the estate, and the necessity of procuring some effective authority for a continuance of their funds in the business, seems not to have occurred to any one. It is not a case where profits were made and accepted for an infant's benefit; nor where an infant, after reaching maturity, ratified the action of an assignee. No authority of any court has been sought, or any attempt to procure the consent of the guardian. It is true that Mrs. Morley was appointed guardian of the infants, but that was not, so far as appears from the evidence, with any idea of attempting to obtain through the guardian authority to continue the interest of the infants in the business. The appointment seems to have been made after the settlement with George's widow, for the purpose of having a portion

130 Mich.—14.

of the allowance made to the widow from the estate drawn for the support of the children. It is not claimed that Mrs. Morley, as guardian, ever did formally consent to a continuance of the business on behalf of the infants, or that such consent was asked or even considered. I do not think such consent can be implied from the mere fact that the guardian was herself engaged in the business, and acquiesced in a continuance of her own funds in its prosecution. Her responsibility or discretion as guardian of the estate of the infants embarked in the business was not exercised.

"At the death of George I. Quimby, all the estate was in the hands of the assignee, and he held the share belonging to these infants as trustee. It was clearly his duty, holding that position, to obtain, by order of a court or otherwise, authority to continue the funds belonging to the infants in that business. I do not think it can be said that the acquiescence of Mrs. Morley, so far as the estate of these infants is concerned, can shift the responsibility from Mr. Uhl to herself as guardian. Whatever might be said as to strangers dealing with the estate, and relying on the apparent acquiescence of the guardian, as to Mr. Uhl his relations were very different. He not only permitted the business to continue under his name and by his authority, but he stood in the relation of legal adviser to the family. He still held the estate in his name as assignee, and under his control. He owed an active duty to these infants, under the circumstances, to preserve their estate, or to have their portion ascertained and turned over to their legal guardian; and, if he desired to relieve himself from personal responsibility for continuing their estate in the business, it was his duty to secure from the court authority to so continue it, or some effectual consent of the guardian, if such could be granted, given with a knowledge of the responsibility therein involved. Under the circumstances of this case, it is the duty of the assignee to account to these infants for their portion of the estate."

*Frederick W. Stevens,* for complainants.

*Burlingame, Belden & Orton* (*Benton Hanchett,* of counsel), for defendant Uhl.

*Knappen & Kleinhans,* for defendants Quimby.

Grant, J. (*after stating the facts*). The above opin-

ion so completely covers the case that little else need be said. Mr. Uhl, upon the execution of the assignment and its acceptance by him, became the trustee for the creditors and Mr. Ichabod L. Quimby. As such it was his duty to dispose of the property, pay the debts, and, if anything remained, turn it over to Mr. Quimby. Under common-law assignments, the assignee has no right to continue to carry on a business without the authority of a court in chancery, or the assent of the creditors and the assignor. In this case both the assignor and the creditors unanimously assented, and both were therefore estopped to deny his authority. *Wilhelm* v. *Byles*, 60 Mich. 561 (27 N. W. 847, 29 N. W. 113).

When the creditors had been paid, the trust as to them was fully discharged. The purpose of the assignment had been accomplished. Mr. Ichabod L. Quimby was then entitled to his own. No retransfer of property was necessary to convey title to him. He could take possession of his own, and carry on the business in his own name. If he chose to make an arrangement with Mr. Uhl, and Mr. Uhl assented, they were then the only ones interested. *Steevens* v. *Earles*, 25 Mich. 40, and cases there cited; *Toms* v. *Williams*, 41 Mich. 552 (2 N. W. 814); *Wilkins* v. *Fitzhugh*, 48 Mich. 78 (11 N. W. 814); *Poole* v. *Munday*, 103 Mass. 174. The assignment did not, after performing its purpose, bind either Mr. Quimby or Mr. Uhl. The moment the debts were paid, they were free to deal with the property and manage it as they saw fit. Mr. Quimby evidently desired to continue the business, which had been so profitable, in the name of Mr. Uhl as assignee. The purchase of property was necessary to the continuance of the business, to effect which large sums of money would be required, which Mr. Quimby did not have. After the death of Mr. Quimby, his son, George, who had been a manager with him, and for some time before his father's death had been the substantial manager, continued the business in the same way, with the assent of all interested. The management was successful under

him. Upon his death the complainant Mrs. Morley, who was familiar with the business, considered herself capable of carrying it on successfully. It is more than probable that she would have done so had the times continued prosperous. She was a woman of intelligence, of energy, and of good business ability.

All the complainants lived together, close to the property, as members of one family. For nearly 20 years they had lived out of the business, in comparative ease, if not luxury, during which time they had received the benefit of Mr. Uhl's name, his advice, his indorsements, and money procured for them by him. The family during these years drew out from the estate $77,741.88. Complainants do not seek to set aside Mr. Uhl's doings for the first 14 years, but only when the times became depressed, and when he was away from home, in Washington and in Germany, in the service of the government. During that time he wrote letters, wishing to be relieved; asking complainants, through Mrs. Morley, to pay the debts for which he was liable, and relieve him from all responsibility. In other words, complainants wish to receive the benefits from the business when it was a success, and to cast upon Mr. Uhl all the losses incurred in depressed times. The claim is without equity, and is unconscionable. Even though Mr. Uhl had carried on the business in a way not strictly authorized by the authority conferred upon him, either as assignee or by the Quimbys, yet, having acted in good faith and with their assent, they cannot select those years in which he made a profit, receive the benefit of that, and compel him to pay for the years when there was a loss. They must take the bad with the good; and it is evident that, for 20 years during which this business was carried on, the profits exceeded the losses. *In re Small's Estate*, 144 Pa. St. 293 (22 Atl. 809); *Hoyt* v. *Sprague*, 103 U. S. 613. Where beneficiaries either expressly or impliedly assent to the action of their trustee in managing their property not in strict accord with the terms of the trust, they will be held to have acquiesced in

:such action.   See authorities above cited; also 11 Am. &
Eng. Enc. Law, 841; *Heyn* v. *O'Hagen*, 60 Mich. 150
(26 N. W. 861).   A party cannot complain when he has
·consented.   *Barton* v. *Gray*, 57 Mich. 636 (24 N. W. 638).

It is hardly conceivable that complainants did not fully
understand the situation.   There can be no pretense that
Mrs. Morley did not.   That she knew her legal rights,
·clearly appears from her letters.   Whether the other com-
plainants had actual knowledge is immaterial.   They
were in position to know, and did know, that Mrs. Morley
was running the business.   When they filed this bill they
·did not ask to have the business closed up, but continued.
One of the very purposes of filing the bill, according to its
·allegations, was to prevent Mr. Uhl's taking steps to close
up the business and secure what was due him.   One of
·their prayers was that a receiver be appointed, and that
he be authorized to continue the business.

Decree is affirmed, with costs.

HOOKER, C. J., MOORE and MONTGOMERY, JJ., con-
·curred.   LONG, J., did not sit.