MORLEY *v.* QUIMBY.

REAL ESTATE—FIXTURES—MORTGAGE.

A mill and milling machinery placed upon land by one occupying under a contract of purchase become part of the real estate, and are covered by a subsequent mortgage of the land.

Appeal from Kent; Wolcott, J. Submitted December 2, 1902. (Docket No. 135.) Decided January 6, 1903.

Bill by Clara S. Morley, administratrix *de bonis non* of the estate of George I. Quimby, deceased, against Emeline K. Quimby, Alice F. Uhl, executrix of the last will and testament of Edwin F. Uhl, deceased, John T. Byrne, and others, for the foreclosure of a mortgage. From a decree for complainant, defendant Uhl appeals. Affirmed.

*Taggart, Denison & Wilson,* for complainant.

*Burlingame, Belden & Orton,* for appellant.

*T. J. O'Brien* and *J. H. Campbell,* for defendant Byrne.

CARPENTER, J. This suit was commenced in the circuit court for the county of Kent, in chancery, for the foreclosure of a mortgage covering lots 82, 83, 84, and 85 of the Coit & Curtis partition plat in the city of Grand Rapids. The only question in controversy is whether or not said mortgage covers the mill and milling machinery therein, standing upon said property.

This mortgage was given by George I. Quimby, complainant's intestate, on the 10th day of May, 1888, to George B. Warren and John A. Manning, executors of the estate of George B. Warren, deceased. It was given to pay a part of the purchase price of said property, which, on said 10th day of May, 1888, was conveyed to said

George I. Quimby by Evelyn L. Hatheway, as executrix of the will of, and universal legatee of, James S. P. Hatheway, deceased. On September 10, 1894, complainant purchased said mortgage with funds of the estate of said George I. Quimby, deceased.

When said George I. Quimby obtained said deed and made said mortgage, the mill and milling machinery in question were standing on the mortgaged property, and being operated by Edwin F. Uhl (testator of defendant and appellant Uhl), as assignee of Ichabod L. Quimby (the father of George I. Quimby). Said James S. P. Hatheway acquired the property August 30, 1881, by purchase at the foreclosure sale of a mortgage given by said Ichabod L. Quimby. When this foreclosure sale occurred, said Uhl, as assignee aforesaid, was in possession of the mortgaged property, operating a mill belonging to the assigned estate. After the foreclosure he continued his occupancy, and carried on business as theretofore. On the 21st of October, 1881, the mill took fire, and was partially destroyed. In 1882, the mill and milling machinery in controversy were constructed by Uhl, at a cost of about $15,000, out of funds of the assigned estate, and by the use of some of the machinery formerly used in the burned mill.

It was decided by this court in the case of *Quimby* v. *Uhl*, 130 Mich. 198 (89 N. W. 722), that after the 1st of July, 1887, when the last of the debts of Ichabod L. Quimby was paid, the title of the assigned property vested in the assignor, said Ichabod L. Quimby.

The court below found that, after said James S. P. Hatheway acquired title to said premises at said foreclosure sale, "the said Edwin F. Uhl, assignee as aforesaid, remained in possession of said premises and continued the business on said premises * * * under an arrangement with said Hatheway by which the said premises were to be occupied by said Edwin F. Uhl, assignee, and conveyed to him, or to said Ichabod L. Quimby, or to such person as the said Ichabod L. Quimby or Edwin F.

Uhl, assignee, should direct;" and "that it was the intention of the parties to said $5,000 mortgage, and of said Edwin F. Uhl, assignee, and of said Ichabod L. Quimby, that said $5,000 mortgage should cover said premises, including all buildings thereon, and including the boiler, engine, and machinery contained in said factory or mill;" and, in accordance with these findings, it was decreed that "the lien of said mortgage extends to all of the buildings and improvements on said premises, including said mill or factory, and the engine, boiler, and all machinery in and about said mill or factory, and all fixtures and appliances designed for use in said factory building." From this decree defendant Uhl appeals, contending that neither of said findings is warranted by the testimony in the case.

As Edwin F. Uhl, Ichabod L. Quimby, George I. Quimby, and James S. P. Hatheway all died before this suit was commenced, we have no direct testimony to prove the arrangement under which said Uhl continued his occupancy of the premises in suit after the foreclosure sale in August, 1881. That arrangement is, however, sufficiently proved by the circumstances of the case, and the answer of said Uhl in the case of *Quimby* v. *Uhl*, heretofore referred to. In that answer, Mr. Uhl said:

"I deny that, after the destruction of the mill standing on the property, I, without leave, caused to be erected on the said premises another mill; but I insist that such mill was reconstructed in pursuance of a valid agreement with the parties in interest, and that said mill has, since its reconstruction, been continuously and profitably operated for the benefit of the said Ichabod L. Quimby and the parties in interest, and that said transaction of the repurchase, after foreclosure, in the name of the said George I. Quimby, was in pursuance of an arrangement between him and the said Ichabod L. Quimby.    *    *    *    I say that the negotiations for perfecting the title to the said Grand Rapids mill property were conducted by the said Ichabod L. Quimby, assisted by the said George I. Quimby; that said Grand Rapids mill was, and ever since has been, essential to the purposes of said business, without

which the same could not successfully have gone forward; that the title thereto was taken in accordance with an arrangement between the said Ichabod L. Quimby and the said George I. Quimby; and, in my opinion, the title was taken in the name of the said George I. Quimby in the expectation, entertained by both, that some time in the future, on just and equitable terms, the said George I. Quimby would become the owner of the Quimby property and business. His death intervening, there was no consummation in that regard.   *   *   *   It was always my understanding that the said Ichabod L. Quimby was the real, substantial owner, but that, by some arrangement between himself and George, the title was held by the latter."

And: ·

"That the property   *   *   .*   was purchased for the benefit of the assigned estate, and paid for out of the proceeds of the business."

The agreement under which said Uhl continued his occupancy must have been, and therefore was, either a contract of sale or a lease. The circumstances are inconsistent with a lease. It is hardly conceivable that Mr. Uhl should have expended $15,000 of trust funds in constructing and equipping a mill, so "essential to the purposes of the business," without being assured of a right to continue its use, or that he made such expenditure with the intention of such a partial destruction as would result from its being detached and removed.

The conduct of Mr. Hatheway, and, after his death, of his personal representative, is equally inconsistent with the theory of a lease. During the seven years intervening between Hatheway's purchase at the foreclosure sale and the conveyance to George I. Quimby, said Uhl, though he paid the taxes on said property, paid almost nothing else which could have been applied for its use. That Mr. Hatheway or the Hatheway estate should have permitted the rent to go uncollected until this time, if there had been, as appellant contends, only a lease, or a lease with the privilege of purchase (which gave the owner no interest in the improvements made by the tenant,—*Osborn* v.

*Potter*, 101 Mich. 301 [59 N. W. 606] ), is inconceivable.
If, on the other hand, the occupancy was under a contract
of sale, and the purchaser had put upon the property im-
provements to the value of $15,000, there was no risk in
letting this account run.

These circumstances, together with the statement of
Mr. Uhl in his answer, contained in the above quotation,
that such mill was constructed ''in pursuance of a valid
agreement," and his reference to the negotiations for
taking the title in the name of George I. Quimby as
'' perfecting '' the title, convince us of the correctness of
the finding of the circuit judge that the occupancy was
based on an agreement for a subsequent conveyance.
The improvements in question, having been made by one
in possession under a contract of purchase, became part of
the real estate.    *Michigan Mut. Life-Ins. Co.* v. *Cronk,*
93 Mich. 49 (52 N. W. 1035); *Cutter* v. *Wait*, 131 Mich.
508 (91 N. W. 753).    A title in them, therefore, passed by
the conveyance to George I. Quimby of May 10, 1888,
which was covered by the mortgage in suit.    It is unnec-
essary to determine whether or not the conveyance of
May 10, 1888, to George I. Quimby merged the interests
in said land theretofore separately held by the Hatheway
estate and Ichabod L. Quimby.    It is sufficient that
George I. Quimby thereby acquired the title of the Hathe-
way estate to the land and improvements thereon to secure
the balance unpaid (part of which is represented by the
mortgage in suit) on said contract of sale.

Appellant's counsel insist that said occupancy was not
under a contract of purchase, because it is not to be pre-
sumed that Mr. Uhl, as assignee, intended the title to
these improvements to pass out of the assigned estate into
Mr. Hatheway.    We do not impute to Mr. Uhl any such
intention, nor does it result from our conclusion that these
improvements at once became the property of Mr. Hathe-
way.    These improvements became part of the real estate.
They enhanced the value of Mr. Hatheway's security.
They belonged, however, to the vendee in the contract, as

the equitable owner of the entire property. If the contract was fulfilled according to its terms, the vendor obtained no benefit whatever from the enhanced value of his security. If the vendee failed to perform his contract, the improvements returned, with the land, to the vendor. It was not so much a violation of Mr. Uhl's trust to make these improvements upon land which he had contracted to buy for the trust as it would have been to make them upon land in which the trust had only a leasehold interest. In the one case the trust could secure the entire benefit of the improvements, while, in the other, it must lose a part or all of that benefit. Even if it be true that, technically speaking, Mr. Uhl had no authority, as assignee, to contract for the purchase of land, it is more likely that he assumed such power than that he voluntarily took a step which inevitably led to a waste of trust assets. We attribute to him a regard for the best interests of his trust in concluding that these improvements were made on land which he had contracted to buy for said trust.

It results from this reasoning that the mortgage in suit covers the property in controversy, and that we have, therefore, no occasion to determine the intent with which it was given.

The decree of the court below is affirmed.

The other Justices concurred.